

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-5-2007

# PA Prison Society v. Kane

Precedential or Non-Precedential: Precedential

Docket No. 06-3354

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"PA Prison Society v. Kane" (2007). *2007 Decisions*. Paper 162.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/162

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 06-3354 & 06-3370
_____


PENNSYLVANIA PRISON SOCIETY; JULIA D. HALL;
GREGORY H. KNIGHT; FIGHT FOR LIFERS, INC.;
WILLIAM GOLDSBY; JOAN PORTER; GRATERFRIENDS,
INC; JOAN F. GAUKER; VINCENT JOHNSON; FRIENDS
COMMITTEE TO ABOLISH THE DEATH PENALTY, INC.;
KURT ROSENBERG; PENNSYLVANIA ABOLITIONISTS
UNITED AGAINST THE DEATH PENALTY; TERRY
RUMSEY; ROGER BUEHL; DOUGLAS HOLLIS; and
DIANNA HOLLIS,
              Plaintiffs-Appellants/Cross-Appellees,

vs.

PEDRO A. CORTÉS, Secretary of the Commonwealth of
Pennsylvania; HONORABLE EDWARD RENDELL, Governor,
Commonwealth of Pennsylvania; CATHERINE BAKER
KNOLL, Chairperson, Board of Pardons; THOMAS W.
CORBETT, JR., Member of Board of Pardons; LOUISE
WILLIAMS, Member of Board of Pardons; RUSSELL
WALSH, Member of Board of Pardons,
              Defendants-Appellees/Cross-Appellants.


_____


On Appeal from the United States District Court
For the Middle District of Pennsylvania
(No. 97-CV-1731)
District Judge: Honorable A. Richard Caputo
_____

Argued on September 19, 2007
_____

Before: SLOVITER, SMITH and GARTH, <u>Circuit</u> <u>Judges</u>

(Opinion Filed: November 5, 2007)

Stephen A. Whinston (**Argued**)
Rebecca M. Hamburg
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
  <u>Attorneys for Appellants/Cross-Appellees</u>

Amy Zapp (**Argued**)
Office of Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120
  <u>Attorneys for Appellees/Cross-Appellant</u>

_____

**OPINION**

_____

GARTH, <u>Circuit</u> <u>Judge</u>:

   This appeal presents an issue of our jurisdiction – standing – that was not raised, and therefore not considered, by the District Court. As the Supreme Court has held, "[t]he rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention." <u>Warth v. Seldin</u>, 422 U.S. 490, 517-18 (1975).

   "For that reason, every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it. . . . And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it."

<u>Bender v. Williamsport Area School Dist.</u>, 475 U.S. 534, 541 (1986) (internal quotation marks and citations omitted).

The instant case arises in the context of a challenge to amendments to the Constitution of the Commonwealth of Pennsylvania ratified in 1997 (the "1997 Amendments"). The Amendments changed the composition of the Pennsylvania Board of Pardons and the voting requirements for obtaining a pardon or commutation of sentence from a majority vote of the Board of Pardons to a unanimous vote.

These two changes resulting from the 1997 Amendments gave rise to the present charges that the Amendments violate the Ex Post Facto and Due Process clauses of the U.S. Constitution. The District Court ruling on cross-motions for summary judgment held, among other things, that the 1997 Amendments violated the Ex Post Facto clause as to *life-sentenced* prisoners, but not as to *death-sentenced* prisoners.

We now hold that the District Court may not have had jurisdiction to decide the merits of the complaint. Accordingly, we will vacate the March 13, 2006 order of the District Court and remand with directions to conduct further proceedings, as necessary, to determine whether any of the plaintiffs has standing and if not, to dismiss the complaint without prejudice.

**I.**

Among the plaintiffs named in this case are three Pennsylvania prisoners, Roger Buehl (serving a death sentence),[1]

---

[1] At oral argument, we were advised by the Attorney General that prisoner Buehl had been resentenced in 1999 to consecutive life-terms pursuant to an agreement whereby Buehl forfeited his right to appeal and his right to further judicial remedies. The Attorney General reserved the right to rescind the agreement and to move to restore Buehl's death sentence if Buehl violated the agreement. At this writing, we have no further knowledge of actions taken by the Attorney General.

Vincent Johnson, and Douglas Hollis (serving life sentences); several non-profit advocacy and prisoner rights groups;[2] and several voters and qualified taxpayers in Pennsylvania.[3] The defendants are Pennsylvania's Governor, Secretary, and four members of the Board of Pardons, including its permanent members, Lieutenant Governor Catherine Baker Knoll and Attorney General Thomas W. Corbett, Jr, who are named in their official capacities as members of the Board.

In Pennsylvania, prisoners condemned to death or serving life imprisonment may not be released on parole except when the Board of Pardons has recommended commutation of sentence and the Governor approves the commutation. 61 P.S. § 331.21(a). Prior to the 1997 Amendments, the Pennsylvania Constitution (Article IV, Section 9)[4] set forth the following provisions authorizing pardons and commutations:

> (a) In all criminal cases except impeachment the Governor shall have power to remit fines and forfeitures, to grant reprieves, commutation of sentences and pardons; *but no pardon shall be granted, nor sentence commuted, except on the recommendation in writing of a majority of the Board of Pardons*, after full hearing in open session, upon due public notice. The recommendation, with the reasons therefor at length, shall be delivered to the Governor and a copy thereof shall be kept on file in the office of

---

[2] Pennsylvania Prison Society, Inc.; Fight for Lifers, Inc.; Graterfriends, Inc.; Friends Committee to Abolish the Death Penalty, Inc.; and Pennsylvania Abolitionists United Against the Death Penalty.

[3] Gregory H. Knight, William Goldsby, Joan Porter, Joan F. Gauker, Kurt Rosenberg, Terry Rumsey, and Diana Hollis.

[4] Like Article II of the U.S. Constitution, Article IV of the Pennsylvania Constitution delineates powers of the executive branch.

-3-

the Lieutenant Governor in a docket kept for that purpose.

(b) The Board of Pardons shall consist of the Lieutenant Governor who shall be chairman, the Attorney General and three members appointed by the Governor with the consent of two-thirds or a majority of the members elected to the Senate as is specified by law for terms of six years. The three members appointed by the Governor shall be residents of Pennsylvania and shall be recognized leaders in their fields; *one shall be a member of the bar, one a penologist, and the third a doctor of medicine, psychiatrist or psychologist.* The board shall keep records of its actions, which shall at all times be open for public inspection.

Pa. Const., Art. IV, § 9 (emphasis added).

On November 4, 1997, the provisions of the Pennsylvania Constitution recited above were amended to provide:

(a) In all criminal cases except impeachment the Governor shall have power to remit fines and forfeitures, to grant reprieves, commutation of sentences and pardons; but no pardon shall be granted, nor sentence commuted, except on the recommendation in writing of a majority of the Board of Pardons, and *in the case of a sentence of death or life imprisonment, on the unanimous recommendation in writing of the Board of Pardons, after full hearing in open session, upon due public notice.* The recommendations, with the reasons therefor at length, shall be delivered to the Governor and a copy thereof shall be kept on file in the office of the Lieutenant Governor in a docket kept for that purpose.

(b) The Board of Pardons shall consist of the
Lieutenant Governor who shall be chairman, the
Attorney General and three members appointed by
the Governor with the consent of a majority of the
members elected to the Senate for terms of six
years. The three members appointed by the
Governor shall be residents of Pennsylvania. One
shall be *a crime victim*; one a corrections expert;
and the third a doctor of medicine, psychiatrist or
psychologist. The board shall keep records of its
actions, which shall at all times be open for public
inspection.

Pa. Const., Art. IV, § 9 (emphasis added).

Thus, under the pre-1997 Constitution, a prisoner applying
for a commutation of sentence could obtain a recommendation
from the Board of Pardons if three of its five members voted in his
favor.[5] After the 1997 Amendments, a prisoner seeking a
commutation had to receive all five votes of the Board for a
recommendation to be considered by the Governor.

The plaintiffs urge that these Amendments violate their Due
Process rights by depriving them of "a reasonable expectation of
the availability and reasonable possibility of executive clemency"
and their rights under the Ex Post Facto clause by retroactively
decreasing the probability of obtaining a commutation or pardon.
A105-06. The complaint alleges that the 1997 changes – which (1)
substituted a crime victim for an attorney on the Board and (2)
replaced the majority rule with a unanimity requirement –
"virtually shut out" prisoners from obtaining clemency. Id.

---

[5] The five-member Board of Pardons under the pre-1997
Constitution consisted of the Lieutenant Governor, Attorney
General, a penologist, medical professional, and an attorney.
The 1997 Amendments substituted a crime victim for the
attorney and a corrections officer for a penologist. The plaintiffs
claim bias by reason of the first substitution. The District Court
rejected this argument.

On March 13, 2006, the District Court ruled in favor of the defendants as to all claims, but held that the change in voting requirement from *majority* to *unanimity* violated the Ex Post Facto clause for *life-sentenced* prisoners.

Plaintiffs timely appeal from the District Court's rulings (1) limiting its Ex Post Facto holding to life-sentenced prisoners; (2) declining to grant injunctive relief; and (3) rejecting their Due Process claims. One defendant – Thomas Corbett, Jr., a member of the Board of Pardons and the Attorney General of Pennsylvania – filed a cross-appeal. In his cross-appeal, Corbett argues, for the first time during this litigation, that the plaintiffs have no standing under Article III of the U.S. Constitution to bring this action.[6]

We have appellate jurisdiction to review the District Court's final order. 28 U.S.C. § 1291. Our review is plenary.

## II.

The Supreme Court has held that the "irreducible constitutional minimum" of standing under Article III requires a plaintiff to establish three elements: an *injury in fact*, i.e., an invasion of a legally protected interest which is actual or imminent, and concrete and particularized, as contrasted with a conjectural or

---

[6] Corbett alternatively argues on the merits, that the District Court erred in failing to dismiss or, alternatively, grant summary judgment to defendants on the Ex Post Facto claim. Plaintiffs respond that Corbett, as the only one of the five-member Board of Pardons who seeks to cross-appeal, lacks standing, see Bender v. Williamsport Area Sch. Dist., 475 U.S. 534 (1986); Karcher v. May, 484 U.S. 72 (1987), notwithstanding Corbett's counter-argument that he has standing in his capacity as Attorney General, the official charged with defending the constitutionality of the laws of Pennsylvania, see 71 P.S. § 732-204 ("It shall be the duty of the Attorney General to uphold and defend the constitutionality of all statutes . . ."). By reason of our holding that the plaintiffs lack standing, we do not reach these arguments as they are moot.

hypothetical injury; a *causal connection* between the injury and the conduct complained of; and *substantial likelihood of remedy* – rather than mere speculation – that the requested relief will remedy the alleged injury in fact. See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992).

Justice Stevens in Bender[7] aptly summarized the elements of standing and emphasized that our obligation to notice defects in subject matter jurisdiction assumes special importance when, as here, constitutional questions are presented:

> In such cases we have strictly adhered to the standing requirements to ensure that our deliberations will have the benefit of adversary presentation and a full development of the relevant facts. . . .
>
> At an irreducible minimum, Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, . . . and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision. . . .
>
> The requirement of actual injury redressable by the court, . . . serves several of the implicit policies embodied in Article III. . . . It tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial

---

[7] In Bender v. Williamsport Area School Dist., the Court held that one member of the school board had no standing to appeal an Establishment question in a school prayer context when the school board itself did not appeal.

action. The 'standing' requirement serves other purposes. Because it assures an actual factual setting in which the litigant asserts a claim of injury in fact, a court may decide the case with some confidence that its decision will not pave the way for lawsuits which have some, but not all, of the facts of the case actually decided by the court.

475 U.S. at 542-43 (internal quotation marks and citations omitted).

Since these are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each of these elements must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. See Lujan v. National Wildlife Federation, 497 U.S. 871, 883-889 (1990). A "federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." Whitmore v. Arkansas, 495 U.S. 149, 155 (1990). Moreover, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. See National Wildlife Federation, 497 U.S. at 883-89. While generalized allegations of injury may suffice at the pleading stage, a plaintiff can no longer rest on such "mere allegations" in response to a summary judgment motion, but must set forth "specific facts" by affidavit or other evidence. Defenders of Wildlife, 504 U.S. at 561; see also Fed. R. Civ. P. 56(e). As the Supreme Court concluded, "because it is not sufficient that jurisdiction may be inferred argumentatively from averments in the pleadings . . . it follows that the necessary factual predicate may not be gleaned from the briefs and arguments themselves." Bender, 475 U.S. at 547 (internal quotation marks and citations omitted).

The case-or-controversy requirement under Article III ensures that "the Federal Judiciary respects the proper – and properly limited – role of the courts in a democratic society." DaimlerChrysler Corp. v. Cuno, __ U.S. __, 126 S.Ct. 1854, 1860

(2006) (ROBERTS, C.J.) (internal quotation marks and citation omitted). Thus, the Court has stressed that "'[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" Raines v. Byrd, 521 U.S. 811, 818 (1997) (quoting Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 37 (1976)).

The standing doctrine serves "to identify those disputes which are appropriately resolved through the judicial process." Defenders of Wildlife, 504 U.S. at 560 (quoting Whitmore, 495 U.S. at 155). "[F]ederal courts sit solely, to decide on the rights of individuals and must refrain from passing upon the constitutionality of an act unless obliged to do so in the proper performance of our judicial function, when the question is raised by *a party whose interests entitle him to raise it*." Hein v. Freedom From Religion Foundation, Inc., 127 S.Ct. 2553, 2562 (2007) (ALITO, J.) (internal quotations marks and citations omitted and emphasis added).

## III.

Applying the tri-partite test for standing – injury, causation, and likelihood of relief, see Bender, 475 U.S. at 542 and Lyons, infra – we turn to the "standing" of the various plaintiffs in this action.

### A.
### Organizational plaintiffs[8]

As recited, the doctrine of standing requires "that the party seeking review be himself among the injured." Sierra Club v. Morton, 405 U.S. 727, 735 (1972). This rule applies with special force to organizations, which are unable to establish standing solely on the basis of institutional interest in a legal issue. Id., at 739 ("[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in

[8] See supra note 2 for the names.

evaluating the problem, is not sufficient by itself.").[9]

Subsequent cases have clarified that an organization or association may have standing to bring suit under two circumstances. First, an organization may be granted "standing in its own right to seek judicial relief from *injury to itself* and to vindicate whatever rights and immunities the [organization or] association itself may enjoy." Warth v. Seldin, 422 U.S. 490, 511 (1975) (emphasis added); see also Havens Realty Corp. v. Coleman, 455 U.S. 363, 372-79 (1982) (holding that a non-profit organization had standing to bring an action in its own right where it alleged that "petitioners' [racial] steering practices have perceptibly impaired [its] ability to provide counseling and referral services for low- and moderate-income home-seekers . . . with the consequent drain on the organization's resources "); Addiction Specialists, Inc. v. Twp. of Hampton, 411 F.3d 399, 406-07 (3d Cir. 2005) (upholding organizational standing where "the corporation itself suffered injuries based on the Township's alleged violations of its own rights"). Alternatively, an association may assert claims on behalf of its members, but only where the record shows that the organization's *individual members themselves have standing to bring those claims*. See Hunt v. Washington State

---

[9] For instance, in Sierra Club v. Morton, the well-known environmental group sought to prevent the construction of a ski resort in Mineral King Valley, California and a highway through the adjacent Sequoia National Park. The Court found that the Sierra Club had no standing because it had "failed to allege that it or its members would be affected in any of their activities or pastimes by the . . . development." 405 U.S. at 735. Although Sierra Club's "complaint alleged that the development would destroy or otherwise adversely affect the scenery, natural and historic objects and wildlife of the park and would impair the enjoyment of the park for future generations," the Court found that "[n]owhere in the pleadings or affidavits did the Club state that its members use Mineral King [Valley or Sequoia National Park] for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents." Id. at 734-35.

Apple Advertising Comm'n, 432 U.S. 333, 343 (1977);[10] NAACP v. Button, 371 U. S. 415, 428 (1963); Public Interest Research Group v. Powell Duffryn Terminals, 913 F.2d 64, 70 (3d Cir. 1990).

The record of this case reveals that neither of these exceptions applies to the organizational plaintiffs here. There is no evidence in the record that these organizations as entities suffered any harm from the 1997 Amendments. Nor are there any allegations to that effect in the unverified complaint.

Moreover, with regard to standing in a representational capacity, the record is silent about the organizational plaintiffs' members and whether those members themselves meet the standing requirements to bring this case. The complaint contains only a bare and inadequate statement that plaintiff Pennsylvania Prison Society "brings this action in its own right and on behalf of its members, including prisoners and adult individuals interested in its above mentioned purposes." A92. Similarly, although the complaint alleges that plaintiff Graterfriends' "membership totals approximately 3,300 individuals, many of whom are life sentenced prisoners," there are no specific facts in the record regarding Graterfriends' individual members and whether any of them meets the standing requirements to pursue the present claims. Neither has Graterfriends itself carried its burden of establishing its own standing by record evidence. See also, Hunt, 432 U.S. at 343; Int'l Bhd. of Teamsters [IBT] v. Transp. Sec. Admin., 429 F.3d 1130, 1135 (D.C. Cir. 2005) ("IBT fails the first prong of [the Hunt] test because it has identified no record evidence whatsoever establishing the flight engineer's disqualification or even his membership in IBT."); National Treasury Employees Union

---

[10] In Hunt v. Washington State Apple Advertising Comm'n, the Court set out three requirements for so called "representational standing": (1) the organization's members must have standing to sue on their own; (2) the interests the organization seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires individual participation by its members. 432 U.S. at 343.

-11-

[NTEU] v. United States Dep't of the Treasury, 25 F.3d 237, 242 (5th Cir. 1994) (finding no standing because "the plaintiffs do not allege that any represented member of the NTEU has actually suffered any such injury as a result of the 'suitability' questionnaire").

The standing of the remaining organizational plaintiffs – Fight for Lifers, Friends Committee to Abolish the Death Penalty and Pennsylvania Abolitionists United Against the Death Penalty – suffers from the same defects.

**B.**
**Voter/taxpayer plaintiffs**[11]

The complaint names seven plaintiffs who are "adult, competent individuals residing in Pennsylvania, and are qualified voters and taxpayers in Pennsylvania." A94. There is no evidence that these individuals have an interest in anything more than mere generalized grievances of concerned citizens. See e.g., Defenders of Wildlife, 504 U.S. at 573-74 ("[A] plaintiff raising only a generally available grievance about government-claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large-does not state an Article III case or controversy"); DaimlerChrysler Corp., __ U.S. __, 126 S.Ct. at 1862 ("Standing has been rejected" where "the alleged injury is not concrete and particularized, . . . but instead a grievance the taxpayer suffers in some indefinite way in common with people generally.") (internal quotation marks and citation omitted); ASARCO Inc. v. Kadish, 490 U.S. 605, 616 (1989) ("[G]eneralized grievances brought by concerned citizens . . . are not cognizable in the federal courts").

Significantly, the plaintiffs do not even argue that the organizational or voter/taxpayer plaintiffs have standing. We therefore hold that the voter/taxpayer plaintiffs, just as the organizational plaintiffs, do not satisfy the constitutional

_____

[11] See supra note 3 for the names.

imperative for standing.

## C.
## Prisoner plaintiffs

Having concluded that the organizational and voter/taxpayer plaintiffs may not maintain this action, we next look to the last category of plaintiffs – the prisoner plaintiffs – who seek our decision on the constitutional claims asserted. With respect to the three prisoner plaintiffs, the complaint contains the following allegations:

10. Plaintiff, Roger Buehl, AM-7936, was, at the time this case was filed, a death-sentenced prisoner convicted and sentenced prior to November 4, 1997. He was among approximately two hundred twenty (220) death sentenced individuals in Pennsylvania who may seek relief through the Pardons Board.

11. Plaintiff Vincent Johnson, AF-3422, SCI-Camp Hill, is a life-sentenced prisoner who was convicted on August 7, 1993, of aggravated robbery and murder in the first degree for a murder committed on or about November 5, 1971. He has filed application[s] with the Board of Pardons on the following dates: April 2, 1991; April 27, 1992; October 24, 1994; and May 23, 1997. His latest application was denied in 1998 by a 2-3 vote.

12. Plaintiff Douglas Hollis, AF-6355, is a life-sentenced prisoner currently incarcerated at SCI-Coal Township. Prior to the 1997 Amendments, he filed an application to the Board of Pardons and received approval of his commutation by a 4-1 vote of the Board, but was rejected by Governor Robert Casey. He subsequently filed another application to the Pardons Board, which was denied.

A94.

Crucially, the record contains no evidence that any of these prisoner plaintiffs have received or may expect to receive a majority vote (i.e., 3-2 or 4-1) of the Board of Pardons after the 1997 Amendments. Such allegations (on a motion to dismiss) or a showing by affidavit or other evidence (on a motion for summary judgment) of a 3-2 or 4-1 vote of the Board could demonstrate that a plaintiff was injured by the 1997 Amendments.[12]

The complaint does not allege and the record contains no evidence that any of these prisoner plaintiffs has had any *actual*

_____

[12] The complaint recites that there are three life-sentenced prisoners, not parties to this case, who were convicted *before* 1997 and received majority (but not unanimous) votes by the Board of Pardons *after* the 1997 Amendments, resulting in a rejection of their applications. Pl. Br. at 18, n. 11. These facts, if established in the record, alleviate the prudential concern that this "opinion of the court [may be read to] provid[e] that all courthouse doors are shut" for potentially-valid claims. Jaffee v. U.S., 663 F.2d 1226, 1266 (3d Cir. 1981) (en banc) (GIBBONS, J. and SLOVITER, J., dissenting). A concern such as this one has led us to provide that the dismissal of this appeal be without prejudice.

Subsequent to oral argument, counsel for the plaintiffs sought to expand the record by including information that a prisoner by the name of Jackie Lee Thompson convicted prior to 1997 had received a 4-1 vote by the Board of Pardons, but had not had her sentence commuted. Although this information had not been a matter of record before the District Court and we are informed by the appellees that the correspondence reflecting this vote is not even reflected on the docket, we nevertheless granted the motion recognizing that it could not affect the standing decision that we have reached because Ms. Thompson was not a party to the present action. We therefore deny reconsideration of our order of October 3, 2007, which granted appellants' motion to supplement the record.

injury or *presently* has an application pending before the Board of Pardons. Nor does the complaint allege or the record evidence show that any of the prisoner plaintiffs has *immediate* plans to file such an application. Nor is there any record evidence to suggest that these specific prisoner plaintiffs, even should they apply, are likely to have received a recommendation for commutation under the pre-1997 regime, for ultimate decision by the Governor. The only allegation concerning these prisoner plaintiffs' commutation prospects is the very general prediction that "[s]aid plaintiffs will, in the future, apply for executive clemency through the Board." A101.

Prisoner plaintiffs have failed for *two reasons* to demonstrate that they have suffered an "injury in fact" – the first of the "irreducible" triad of Article III standing requirements. To constitute injury in fact, harm to the plaintiff must be an invasion of a legally protected interest that is "distinct and palpable, as opposed to merely abstract and . . . actual or imminent, not conjectural or hypothetical." Whitmore v. Arkansas, 495 U.S. 149, 155 (1990) (internal quotation marks and citations omitted and emphasis added). Here, prisoner plaintiffs have not demonstrated (1) "actual or imminent" harm because they failed to allege or adduce evidence of any concrete plans to apply for a commutation in the immediate future; nor (2) "distinct and palpable" injury because they have not shown that, even if they do apply to the Board of Pardons, they are sufficiently likely to be personally harmed by the changed voting requirement in the 1997 Amendments – i.e., that they are likely to receive a majority of votes favoring a commutation recommendation from the Board.

In Defenders of Wildlife, the Court considered a challenge to a revision of a federal regulation providing that the Endangered Species Act does not apply to United States government activities overseas. Two plaintiffs had submitted detailed affidavits describing their viewing of endangered animals on past trips abroad, and stated their "inten[tion] to return . . . in the future." Id. at 563. The Court held that such indefinite future plans were insufficient to establish injury in fact:

[T]he affiants' profession of an "intent" to return

-15-

to the places they had visited before – where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species – is simply not enough. *Such "some day" intentions -- without any description of concrete plans, or indeed even any specification of when the some day will be -- do not support a finding of the "actual or imminent" injury that our cases require.*

Id. at 564 (emphasis added).

The Court took issue with the dissent's view that it would be sufficient for the plaintiffs to show that they would "*soon* return to the project sites," id., on the grounds that it would eviscerate the imminence requirement:

Although "imminence" is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes -- that the injury is "certainly impending." It has been stretched beyond the breaking point when . . . the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control. *In such circumstances we have insisted that the injury proceed with a high degree of immediacy*, so as to reduce the possibility of deciding a case in which no injury would have occurred at all.

Id. at 564 n.2 (internal citations omitted and emphasis added).

Here, as in Defenders of Wildlife, prisoner plaintiffs offer only the most vague non-concrete "some day" intentions that they "will, in the future, apply for executive clemency." A101. Such allegations of injury at some indefinite future time – where the acts necessary to make the injury happen are within the prisoner plaintiffs' own control – lack the high degree of immediacy

-16-

required to constitute injury in fact and provide Article III standing. Id. at 564 n.2.

Even if prisoner plaintiffs had alleged and sufficiently introduced evidence that they had imminent plans to file an application for a commutation, they would still fail to demonstrate injury in fact because they have not shown a sufficient *likelihood* that they *personally* would be harmed by the change in voting requirements wrought by the 1997 Amendments. The relevant precedent is the seminal Supreme Court case of City of Los Angeles v. Lyons, 461 U.S. 95 (1983).

Lyons involved a suit to enjoin as unconstitutional a policy of the Los Angeles Police Department permitting the use of chokeholds in instances where the police were not threatened with death or serious bodily injury. Though Lyons could seek damages for his injuries as a result of the alleged policy, the Court held that he had no standing to seek injunctive relief *because he could not demonstrate a sufficient likelihood that he, personally, would be choked again in the future*: "Lyons' standing to seek the injunction requested depended on whether *he was likely* to suffer future injury from the use of the chokeholds by police officers. Id. at 105. The Court elaborated that:

> Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.

Id. at 111; see also Defenders of Wildlife, 504 U.S. at 564 (expressly applying Lyons to uphold dismissal of a complaint on the basis of "plaintiff's failure to show that he will soon expose himself to the injury").

In addition to their failure to allege any plan to apply for a commutation in the near future, prisoner plaintiffs have offered no evidence that they *personally* are *likely* to be injured by the 1997

Amendments. The record is bare of any information about prisoner plaintiffs' backgrounds, and thus whether they would be good, i.e., likely, candidates for commutation.[13] Prisoner plaintiffs would only be injured by the 1997 Amendments if they received a majority (but less than unanimous vote) by the Board in favor of commutation. Less than a majority would have been insufficient even under the pre-1997 regime. Thus, to show a likelihood of injury, prisoner plaintiffs must offer facts showing that they likely would have received a majority vote in favor of recommendation. But they have not offered any evidence in this regard.

None of the prisoner plaintiffs can establish a "concrete and particularized" injury without having obtained at least three votes in the Board – which would have been sufficient for its recommendation of commutation of sentence before the 1997 Amendments but are insufficient under the current provisions. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 210 (1995) (quoting Defenders of Wildlife, 504 U.S. at 560).

The Adarand Court found standing for a subcontractor challenging the constitutionality of a federal program because the subcontractor had actually been denied a contract under the challenged rules *and* had shown during discovery that it was very likely to bid in the relatively near future on another contract under the same provisions. 515 U.S. at 210, 212. Given that it was denied a contract, the subcontractor unquestionably had standing to seek damages. Id. at 210. Moreover, it had standing to seek forward-looking declaratory and injunctive relief against any future use of the challenged rules because its alleged injury was concrete and particularized – "*discriminatory* classification prevent[ing] the plaintiff from competing on an equal footing," id. at 211 (emphasis added)[14] – and imminent – its general management testified in

_____

[13] Indeed, plaintiffs state in their brief that "[a]lthough prisoners were named as plaintiffs, their individual circumstances were never at issue in the case." Pl. Br. at 19.

[14] The racially discriminatory aspect of the challenged bidding rules was sufficient to establish concrete and particularized injury, since the Supreme Court has long-held

-18-

deposition that the company has bid on every government project, which were open for bidding at least once a year. Id. at 211-12. Thus, the Court concluded, "[b]ecause the evidence in this case indicates that the [government] is likely to let contracts . . . that contain [the challenged] compensation clause at least once per year in Colorado, that [the subcontractor] is very likely to bid on each such contract, and that [it] often must compete for such contracts against small disadvantaged businesses, we are satisfied that [it] has standing to bring this lawsuit." Id. at 212.

In contrast to Adarand, the prisoner plaintiffs here have not established any concrete and particularized injury, since they did not and would not have obtained a recommendation of the Board of Pardons even under the pre-1997 Amendments majority voting requirement. Additionally, the prisoner plaintiffs cannot claim any form of stigma associated with applying under the amended Pennsylvania Constitution. In short, they have not shown any injury.

Plaintiffs argue that standing requirements should be relaxed here because they bring a *facial* challenge to the constitutionality of the 1997 Amendments. The record does contain evidence, offered by the parties on the merits of the Ex Post Facto claim, showing that the absolute number of Board of Pardon recommendations for commutations has decreased since 1997 when the unanimity requirement took effect. However, this decrease had begun already in 1995, long before the amendments

_____

since Brown v. Board of Education, 347 U.S. 483 (1954), that the stigma associated with racial classification is prima facie injury. See, e.g., Richmond v. J.A. Croson Co., 488 U.S. 469, 516-517 (1989) ((STEVENS, J., concurring in part and concurring in judgment) ("Although [the legislation at issue] stigmatizes the disadvantaged class with the unproven charge of past racial discrimination, it actually imposes a greater stigma on its supposed beneficiaries")) (quoted in Adarand Constructors, Inc. v. Pena, 515 U.S. at 229).

-19-

went into effect.[15]  Thus, this evidence fails the causation element of standing.  <u>Defenders of Wildlife</u>, 504 U.S. at 560.  Moreover, even if the statistical evidence actually showed a decreased probability of receiving a recommendation caused by the 1997 Amendments – an inference disputed by defendants – the prisoner plaintiffs would lack standing because they must show that particularized injury that applies to them personally.  As the Supreme Court noted in <u>Lyons</u>:

> Of course, it may be that among the countless encounters between the police and the citizens of a great city such as Los Angeles, there will be certain instances in which strangleholds will be illegally applied and injury and death unconstitutionally inflicted on the victim. . . . [But] it is surely no more than speculation to assert either that Lyons himself will again be involved in one of those unfortunate instances, or that he will be arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly force or serious bodily injury.

<u>Lyons</u>, 461 U.S. at 108.

None of the cases cited by plaintiffs support a general proposition that facial challenges to the validity of a statute need not satisfy the Article III requirements for standing.  The cited

---

[15] The following are the number commutation recommendations granted in Pennsylvania from 1989 to 2005.

| | | |
|---|---|---|
| 1989: 19 | 1996: 1 | 2002: 1 |
| 1990: 10 | 1997: 0 | 2003: 1 |
| 1991: 20 | 1998: 0 | 2004: 1 |
| 1992: 22 | 1999: 0 | 2005: 0 |
| 1993: 16 | 2000: 0 | |
| 1994: 10 | 2001: 0 | |
| 1995: 3 | 2002: 1 | |

cases arise in the highly exceptional First Amendment context. <u>See</u> <u>Lakewood v. Plain Dealer Pub. Co.</u>, 486 U.S. 750, 756 (U.S. 1988) ("*In the area of freedom of expression* it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion . . .") (citing <u>Freedman v. Maryland</u>, 380 U.S. 51, 56 (1965)) (emphasis added); <u>Steffel v. Thompson</u>, 415 U.S. 452 (1974) (upholding facial First Amendment challenge to criminal trespass statute prohibiting distribution of political handbills); <u>Peachlum v. City of York</u>, 333 F.3d 429, 435 (3d Cir. 2003) ("*A First Amendment claim*, particularly a facial challenge, is subject to a relaxed ripeness standard. . . . The courts have repeatedly shown solicitude for First Amendment claims because of concern that, even in the absence of a fully concrete dispute, unconstitutional statutes or ordinances tend to chill protected expression among those who forbear speaking because of the law's very existence.") (internal citations omitted and emphasis added); <u>Presbytery of the Orthodox Presbyterian Church v. Florio</u>, 40 F.3d 1454, 1458 (3d Cir. 1994) (finding ripe plaintiffs' First Amendment challenge to state law prohibiting discrimination on the basis of sexual orientation). The relaxed standing requirement in these cases *apply solely in the First Amendment context*, and therefore has no application to the commutation procedures here at issue.

One of the least compelling arguments the prisoner plaintiffs assert is that – despite the absence of a pending or soon to be filed commutation application, or the likelihood that any plaintiff's application would be denied as a result of the 1997 Amendments – they have sustained a cognizable injury under Article III because they are thereby discouraged from even attempting to apply for a commutation. <u>See</u> <u>Howard v. New Jersey Dep't of Civil Service</u>, 667 F.2d 1099, 1103 (3d Cir. 1981) ("Threatened injury can constitute injury-in-fact where the threat is so great that it discourages the threatened party from even attempting to exercise his or her rights.") (citing <u>International Brotherhood of Teamsters v. United States</u>, 431 U.S. 324, 365-66 (1977)). Similarly, plaintiffs argue that "the passage of the Amendments has effectively put out a 'Do Not Apply' message to death and life sentenced inmates." Pl. Br. at 11. This argument is without merit,

since plaintiff Johnson and other prisoners not parties to this case[16] have applied for commutations after the 1997 Amendments went into effect and would have standing upon obtaining three votes in their favor. Moreover, certain prisoners, such as plaintiff Buehl, may prefer to seek relief from their sentences under other options provided by the legal system, such as motions for resentencing or writs of habeas corpus.

## IV.

Because the issue of standing was raised for the first time on appeal, none of the plaintiffs have had the opportunity to present evidence or to litigate this issue. We will therefore dismiss this appeal *without prejudice* for lack of jurisdiction and remand to the District Court for further proceedings consistent with this Opinion to develop the record in order to determine plaintiffs' standing to bring this action.

---

[16] See supra note 12.