PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 09-3017

_____

PA PRISON SOCIETY;
JULIA D. HALL; GREGORY H. KNIGHT;
FIGHT FOR LIFERS INC; WILLIAM GOLDSBY;
JOAN PORTER; GRATERFRIENDS INC.;
JOAN F. GAUKER; VINCENT JOHNSON;
FRIENDS COMMITTEE TO ABOLISH THE
DEATH PENALTY INC.; KURT ROSENBERG;
PENNSYLVANIA ABOLITIONISTS UNITED
AGAINST THE DEATH PENALTY; TERRY RUMSEY;
ROGER BUEHL; DOUGLAS HOLLIS; DIANNA HOLLIS

v.

PEDRO A. CORTES,
Secretary, Commonwealth of Pennsylvania;
HONORABLE EDWARD G. RENDELL;
JOSEPH B. SCARNATI, LT GOVERNOR;
THOMAS W. CORBETT, JR.; LOUISE B. WILLIAMS;
RUSSELL A. WALSH, Ph.D.; JOHN E. WETZEL

(Pursuant to Fed. R. App. P. 43)

Joseph B. Scarnati, Thomas W. Corbett,
Louise B. Williams, Russell A. Walsh,
John E. Wetzel,
                    Appellants

_____

No. 09-3018

_____

PENNSYLVANIA PRISON SOCIETY;
DOUGLAS HOLLIS;  PAROLE PLAINTIFFS,
KEITH SMITH, JACKIE LEE THOMPSON

(Pursuant to F.R.A.P. 12(A))

v.

PEDRO A. CORTES;
HONORABLE EDWARD G. RENDELL;
JOSEPH B. SCARNATI, LT. GOVERNOR;
THOMAS W. CORBETT, JR.; LOUISE B. WILLIAMS;
RUSSELL A. WALSH, Ph.D.; JOHN A. WETZEL

                    Pennsylvania Prison Society,
                    Douglas Hollis, Keith Smith,
                    Jackie Lee Thompson,
                              Appellants

2

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal Action No. 1-97-cv-01731)
District Judge: Honorable A. Richard Caputo

Argued April 19, 2010
Before:  SCIRICA, AMBRO and ALARCÓN[*], <u>Circuit Judges</u>

(Filed: October 1, 2010)

Thomas W. Corbbett, Jr.
   Attorney General
Richard A. Sheetz, Jr.
   Executive Deputy Attorney General
Amy Zapp (Argued)
   Chief Deputy Attorney General
   Special Litigation Section
Office of the Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120
         Counsel for Appellants/Cross-Appellees

---

[*]Honorable Arthur L. Alarcón, Senior United States Circuit Judge for the Ninth Circuit Court of Appeals, sitting by designation.

3

Stephen A. Whintson (Argued)
245 North Broad Street
Suite 300
Philadelphia, PA 19107
        Counsel for Appellees/Cross-Appellants

---

OPINION OF THE COURT

---

ALARCÓN, Circuit Judge

We are asked to decide whether an amendment to Article IV, § 9(a) of the Constitution of the Commonwealth of Pennsylvania, that alters the voting procedures employed by the Pennsylvania Board of Pardons to require unanimity in recommending pardons and commutations for life-sentenced prisoners to the Governor, violates the *Ex Post Facto* Clause of the United States Constitution.

The District Court ruled that the constitutional amendment, passed by Pennsylvania voters in 1997 ("1997 Amendment"), violates the *Ex Post Facto* Clause for prisoners sentenced to a term of life imprisonment prior to its effective date. Because none of the prisoners who are seeking relief in this action has shown that there is a significant risk the 1997 Amendment will increase the length of their punishment, an element essential to establishing an *ex post facto* violation, Plaintiffs have failed to state a viable claim. We will therefore

4

reverse and remand with instructions to dismiss the *ex post facto* action.

**I**

Under the Constitution of the Commonwealth of Pennsylvania, the Governor is empowered "in all criminal cases except impeachment . . . to grant reprieves, commutation of sentences and pardons. . . ." Pa. Const. art. IV, § 9(a). "Like Article II of the U. S. Constitution, Article IV of the Pennsylvania Constitution delineates powers of the executive branch." *Pa. Prison Soc'y v. Cortés*, 508 F.3d 156, 159 n.4 (3d Cir. 2007) ("*Prison Society I*"). The Governor's decision whether to commute a sentence is based upon recommendations made by the Pennsylvania Board of Pardons ("the Board of Pardons"), also part of the executive branch. Pa. Const. art. IV, § 9(b)[1]; *see also Commonwealth ex rel. Cater v. Myers*, 412 Pa.

---

[1]Prior to its amendment, Pa. Const. art. IV, § 9(b) provided:

> The Board of Pardons shall consist of the Lieutenant Governor who shall be chairman, the Attorney General and three members appointed by the Governor with the consent of two-thirds or a majority of the members elected to the Senate as is specified by law for terms of six years. The three members appointed by the Governor shall be residents of Pennsylvania and shall be recognized leaders in their fields; one shall be a member of

5

67, 71 (1963) ("The Board of Pardons is a board of clemency which is constitutionally ordained to recommend to the Governor of Pennsylvania the grant or denial of clemency, i.e., commutation of sentence or pardon of persons who have been convicted of and sentenced for crime.").[2]

Prior to November 4, 1997, Article IV, § 9(a) of the Constitution of the Commonwealth of Pennsylvania provided, in relevant part, that:

> In all criminal cases except impeachment the Governor shall have the power to remit fines and forfeitures, to grant reprieves, commutation of sentences and pardons; but no pardon shall be granted, nor sentence commuted, except on the recommendation in writing **of a majority** of the

> the bar, one a penologist, and the third a doctor of medicine, psychiatrist or psychologist. The board shall keep records of its actions, which shall at all times be open for public inspection.

Pa. Const. art. IV, § 9(b) (amended 1997).

[2]While commutations of sentences and pardons for persons convicted of crimes are both acts carried out by the Governor of Pennsylvania under his or her clemency power, the issue relevant in this appeal involves only actions taken by the Board of Pardons on applications for commutation by inmates sentenced to life imprisonment without parole.

6

Board of Pardons, after full hearing in open session, upon public notice . . . .

Pa. Const. art. IV, § 9(a) (amended 1997) (emphasis added).

In 1997, a ballot question proposing an amendment to the constitution that would alter the composition of and voting procedures employed by the Board of Pardons was scheduled to be submitted to Pennsylvania voters. The proposed ballot question read:

> Shall the Pennsylvania Constitution be amended to require a unanimous recommendation of the Board of Pardons before the Governor can pardon or commute the sentence of an individual sentenced in a criminal case to death or life imprisonment, to require only a majority vote of the Senate to approve the Governor's appointments to the Board, and to substitute a crime victim for an attorney and a corrections expert for a penologist as Board members?

*Pa. Prison Soc'y v. Commonwealth*, 565 Pa. 526, 532 (2001). The 1997 Amendment of the Board of Pardons' procedures was motivated by a 1994 incident in which Reginald McFadden, a prisoner sentenced to life imprisonment who had been granted commutation by the Governor, after a majority of the Board of Pardons voted to recommend it, committed a new murder in the State of New York. (2d Amend Compl. ¶ 26); *see also Hearings on Pennsylvania Board of Probation and Parole*

7

*Reforms Before the House Judiciary Comm.*, 1995 Gen. Assembly 179th Sess. (Pa. June 9, 1995); S. of Pa. Judiciary Comm., Chairman's Rep. Investigation into the Parole of Robert Simon, 1995 Gen. Assembly, 179th Sess. 1-6 (Pa. 1996); (Appellants' Br. 19 (citing A000522-A000525, testimony of Mark Singel)); Appellees' Br. 43.)[3].

---

[3]*See also Changing Pennsylvania's Sentencing Philosophy Through the Elimination of Parole for Violent Offenders*, 5 Widener J. Pub. L. 269 (1996), discussing the McFadden case:

> One of the most sensational cases of early release was that of Reginald McFadden. McFadden was pardoned after serving less than twenty-five years of a life sentence for murdering a sixty-year-old Philadelphia woman. Ninety-two days after his July 7, 1994, release to New York State, under the interstate parole system, McFadden was charged with, and later convicted of, beating and raping a fifty-five-year-old South Nyack woman. He was also charged with raping and murdering a seventy-eight[-]year[-]old Long Island woman. Marlene Aig, *24 Years, A Convict, He Played the System*, PITTSBURGH POST GAZETTE, May 30, 1995, at C1. More recently, McFadden was convicted of the murder of a forty-two-year-old Long Island man. *Convicted Murderer Found Guilty Again*, HARRISBURG PATRIOT EVENING NEWS, Mar. 14, 1996, at B4. Because parole is

On November 4, 1997, Pennsylvania voters approved the ballot measure. Article IV, § 9 (a) of the Constitution of the Commonwealth of Pennsylvania was amended to read as follows:

> In all criminal cases except impeachment, the Governor shall have power to remit fines and forfeitures, to grant reprieves, commutation of sentences and pardons; but no pardon shall be granted, nor sentence commuted, except on the recommendation in writing of a majority of the Board of Pardons, and, in the case of a sentence of death or life imprisonment, on the unanimous recommendation in writing of the Board of Pardons, after full hearing in open session, upon due public notice.

Pa. Const., art. IV, § 9(a). Accordingly, the 1997 Amendment changed the number of votes needed to support the Pardon Board's recommendation to the Governor that a life sentence be commuted to a term of years with the possibility of parole from majority to unanimous and substituted a crime victim instead of an attorney and a corrections expert instead of a penologist as

---

> not available to persons sentenced to life imprisonment, McFadden was released through the pardon process.

*Id*. at 296 n.95.

9

Board members.

**A**

Pennsylvania law distinguishes between the exercise of the Governor's clemency power to grant pardons and commutations pursuant to the Constitution of the Commonwealth, and the authority to release a prisoner on parole, which is an independent function of the Board of Probation and Parole. Unlike the Board of Pardons, which is constitutionally mandated and operates as a function of the Pennsylvania Department of Justice, 71 Pa. Cons. Stat. § 12, the Pennsylvania Board of Probation and Parole is an independent board, originally created by the Parole Act of 1941. *See* Parole Act of 1941, 1941 Pa. Laws 861 (codified as amended at 61 Pa. Stat. Ann. §§ 331.1-.21 *repealed by* Act of Aug. 11, 2009, ch. 61, 2009 Pa. Laws 33). The Parole Act states that "[t]he parole system provides several benefits to the criminal justice system, including the provision of adequate supervision of the offender while protecting the public, the opportunity for the offender to become a useful member of society and the diversion of appropriate offenders from prison." *Id*.; *see also* 61 Pa. Cons. Stat. § 6111(a)-(b) (2010) (providing that the Board of Probation and Parole is "an independent administrative board for the administration of the probation and parole laws of this Commonwealth" consisting of nine members who are appointed by the Governor).

By contrast, "[t]he constitutional power of the Governor

10

to grant pardons and commutations of sentence is exclusive. . . " *Commonwealth ex rel. Banks v. Cain*, 345 Pa. 581, 585 (1942). As the Pennsylvania Supreme Court explained in *Commonwealth v. Zook*, 532 Pa. 79, 114 (1992):

> The Governor's power to commute sentences is found within Article IV, § 9 of the Pennsylvania Constitution. Under our Constitution of 1776, § 20, the Supreme Executive Council had the power to grant pardons and remit fines in all cases except in cases of impeachment. This doctrine has evolved over the years into the present day enactment, which provides in pertinent part: (a) In all criminal cases except impeachment, the Governor shall have power to remit fines and forfeitures, to grant reprieves, commutation of sentences and pardons; but no pardon shall be granted, nor sentence commuted, except on the recommendation in writing of a majority of the Board of Pardons, after full hearing in open session, upon due public notice . . . .

*Id.* (citing Pa. Const. art. IV, § 9) (citations omitted).[4] In *Banks*,

---

[4]All fifty states have incorporated clemency provisions in their respective constitutions. *See* Ala. Const. amend. 38; Alaska Const. art. III, § 21; Ariz. Const. art. V, § 5; Ark. Const. art. VI, § 18; Cal. Const. art. V, § 8; Colo. Const. art. IV, § 7; Conn. Const. art. IV, § 13; Del. Const. art. VII, § 1; Fla. Const.

11

the court discussed the differences between the concepts of parole and pardons and explained that:

> [t]here is a radical difference between a pardon and a parole. A pardon is the exercise of the sovereign's prerogative of mercy. It completely frees the offender from the control of the state. It not only exempts him from further punishment but relieves him from all the legal disabilities resulting from his conviction. It blots out the very existence of his guilt, so that, in the eye of the

art. IV, § 8; Ga. Const. art. IV, § 2; Haw. Const. art. V, § 5; Idaho Const. art. IV, § 7; Ill. Const. art. V, § 12; Ind. Const. art. V, § 17; Iowa Const. art. 4, § 16; Kan. Const. art. I, § 7; Ky. Const. § 77; La. Const. art. IV, § 5(E); Me. Const. art. V, pt. 1, § 11; Md. Const. art. II, § 20; Mass. Const. pt. II, ch. 2, § 1, art. 8; Mich. Const. art. V, § 14; Minn. Const. art. V, § 7; Miss. Const. art. V, § 124; Mo. Const. art. IV, § 7; Mont. Const. art. VI, § 12; Neb. Const. art. IV, § 13; Nev. Const. art. V, § 13; N.H. Const. pt. 2, art. 52; N.J. Const. art. V, § 2; N.M. Const. art. V, § 6; N.Y. Const. art. IV, § 4; N.C. Const. art. III, § 5(6); N.D. Const. art. V, § 7; Ohio Const. art. III, § 11; Okla. Const. art. VI, § 10; Or. Const. art. V, § 14; Pa. Const. art. IV, § 9; R.I. Const. art. IX, § 13; S.C. Const. art. IV, § 14; S.D. Const. art. IV, § 3; Tenn. Const. art. III, § 6; Tex. Const. art. IV, § 11; Utah Const. art. VII, § 12; Vt. Const. ch. II, § 20; Va. Const. art. V, § 12; Wash. Const. art. III, § 9; W. Va. Const. art. VII, § 11; Wis. Const. art. V, § 6; Wyo. Const. art. IV, § 5.

12

law, he is thereafter as innocent as if he had never committed the offense. A parole, on the other hand, does not obliterate the crime or forgive the offender. It is not an act of clemency, but a penological measure for the disciplinary treatment of prisoners who seem capable of rehabilitation outside of prison walls. It does not set aside or affect the sentence; the convict remains in the legal custody of the state and under the control of its agents, subject at any time, for breach of condition, to be returned to the penal institution. Neither is a parole a commutation of sentence within the meaning of that term in the constitutional provision. When our present constitution was adopted, parole, as a penological expedient, was unknown to American jurists and legislators, and commutation was then generally understood as meaning a reduction in the length of the sentence, effecting a discharge of the prisoner without any further supervision over him by the state authorities.

*Banks,* 345 Pa. at 584-85 (citations omitted). *See also Commonwealth v. Sutley*, 474 Pa. 256, 273-74, 274 n.12 (1977) ("The power of commutation is an adjunct of the pardoning power, and can be granted only by the authority in which the pardoning power resides. . . . As defined by this Court, the pardon is: the exercise of the sovereign's prerogative of mercy.

13

. . .") (citations and internal quotations omitted).

**B**

This action was originally brought as a petition for review in the Commonwealth Court of Pennsylvania on October 16, 1997, before the ballot question proposing the 1997 Amendment had been approved by voters. In the original action, the Pennsylvania Prison Society and others challenged the ballot question as violative of various provisions of the United States and Pennsylvania Constitutions.[5] *See Pa. Prison*

---

[5]Various representational organizations, including the Pennsylvania Prison Society, certain private individuals, and three individual prisoners filed this original action challenging the 1997 Amendment (collectively referred to as "Plaintiffs"). Sued in their official capacities were Pedro A. Cortés, Secretary of the Commonwealth of Pennsylvania; Edward Rendell, Governor of Pennsylvania; and Board of Pardons members Lieutenant Governor Joseph B. Scarnati, Attorney General Thomas W. Corbett, Jr., Louise Williams, Dr. Russell Walsh, and John Wetzel (collectively "the Commonwealth").

Following the District Court's judgment upon remand from this Court's decision in *Prison Soc'y I*, current Board of Pardons members Lieutenant Governor Joseph B. Scarnati, Attorney General Thomas W. Corbett, Jr., Louise Williams, Dr. Russell Walsh, and John Wetzel ("the Board of Pardons") appealed. Neither the Governor nor the Secretary of State is participating in these cross appeals. The only Plaintiffs who

14

*Soc'y v. Commonwealth*, 727 A.2d 632, 635 (Pa. Commw. Ct. 1999), *rev'd*, 565 Pa. 526 (2001).

On November 12, 1997, after voters approved the 1997 Amendment, the Commonwealth removed the action to the United States District Court for the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1441(a). On January 5, 1998, Plaintiffs filed an amended complaint alleging that the 1997 Amendment violates various provisions of the United States Constitution. On January 15, 1998, the District Court granted the parties' joint motion to remand the state law claims and to stay the federal claims pending resolution of the state law claims.

The Commonwealth Court determined that "the November 4, 1997 vote on the ballot question [was] null and void, as the single ballot question contained five amendments to the Pennsylvania Constitution." *Pa. Prison Soc'y v. Commonwealth*, 727 A.2d at 636. On July 25, 2001, the Supreme Court of Pennsylvania reversed the Commonwealth Court and upheld the 1997 Amendment as properly submitted. *Pa. Prison Soc'y v. Commonwealth*, 565 Pa. 526, 530, 537 (2001) (holding that "the voters should be given free opportunity to modify the fundamental law as may seem to them fit . . . .") (quoting *Taylor v. King*, 284 Pa. 235 (1925) (overruled in part by *Stander v. Kelley*, 433 Pa. 406 (1969)).

--------

filed a cross-appeal were the Pennsylvania Prison Society, Douglas Hollis, Keith Smith, and Jackie Lee Thompson.

On July 29, 2002, after resolution of the state law claims, Plaintiffs filed a second amended complaint in the District Court presenting federal and state constitutional challenges to the 1997 Amendment, including a claim that for prisoners sentenced to life imprisonment prior to the effective date of the 1997 Amendment, the change in the voting requirements for the Board of Pardons violates the *Ex Post Facto* Clause as alleged in Count II. Plaintiffs' second amended complaint also alleges that the 1997 Amendment violates: the rights of life prisoners and prisoners under death sentence under the Due Process Clause (Count I); the Equal Protection Clause (Count III); Pennsylvania voters' rights under the Due Process Clause (Count IV); the Eighth Amendment (Counts V and VI); and the Guarantee Clause (Count VII). Plaintiffs also brought claims under the Pennsylvania Constitution (Counts VII and VIII). In their second amended complaint, Plaintiffs requested declaratory and injunctive relief.

On August 12, 2002, the Commonwealth moved to dismiss Plaintiffs' second amended complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). On March 6, 2003, the District Court issued a memorandum in which it granted the Commonwealth's motion to dismiss Counts III through VIII pursuant to Rule 12(b)(6), and ordered the dismissal of the claim in Count I that due process rights of inmates with life sentences were violated. The District Court denied the Commonwealth's motion to dismiss the due process claims of inmates under death sentences as alleged in Count I, as well as the Commonwealth's

16

motion to dismiss the prison inmates' claim under the *Ex Post Facto* Clause as alleged in Count II. (Mem. Op., March 6, 2003.)

In denying the motion to dismiss the *ex post facto* claim, the District Court relied upon Supreme Court cases analyzing the impact of changes in the eligibility requirements for <u>parole</u> release enacted by various states. It concluded that resolution of the *ex post facto* claim required a factual analysis, because "when an amendment 'does not by its own terms show a significant risk, the [prisoner] must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule.'" (*Id*. at 11-12 (quoting *Garner v. Jones*, 529 U.S. 244, 255 (2000) (considering whether an amendment to a Georgia rule that changed <u>parole</u> reconsideration review procedures violated the *Ex Post Facto* Clause)).)

Both sides moved for reconsideration of the District Court's March 6, 2003, order. The Plaintiffs argued that the District Court should reconsider its ruling on the *ex post facto* claim in light of *Smith v. Doe*, 538 U.S. 84 (2003), wherein the Supreme Court held that in determining whether legislation violates the *Ex Post Facto* Clause, a court must "ascertain whether the legislature meant the statute to establish 'civil' proceedings." *Id*. at 92 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)). The District Court denied the Plaintiffs' motion for reconsideration. It held that

17

[t]he present case is distinguishable from both *Doe* and *Hendricks* in that it involves a challenge to retroactive changes in state law governing prisoners' parole, instead of challenges to legislation regarding "sexual predators" or sexual offenders. The Supreme Court has consistently held that, in cases regarding retroactive changes in state law governing prisoners' parole, the relevant inquiry is whether the amendments create a significant risk of prolonging prisoners' sentences.

(Mem. Op., May 6, 2003, at 5-6 (emphasis added) (citing *Garner*, 529 U.S. at 251; *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (considering whether revisions in Florida law impacting the award of early parole release credits to prison inmates violates the *Ex Post Facto* Clause); *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499 (1995) (considering whether a law changing the procedures concerning the accessibility of parole suitability hearings violated the *Ex Post Facto* Clause); *Mickens-Thomas v. Vaughn*, 321 F.3d 374 (3d Cir. 2003) (considering whether material modifications of Pennsylvania parole laws violated the *Ex Post Facto* Clause).)

The Commonwealth moved the District Court to reconsider its partial denial of Plaintiffs' due process claim in Count I regarding prisoners sentenced to death, and urged it instead to dismiss the claim in its entirety. The Commonwealth argued that "[w]hether or not certain Board [of Pardons]

18

members are biased against granting clemency does not render the amendment unconstitutional, although it may be grounds for disqualification in a particular case." (Defs.' Br. in Supp. of Mot. for Consideration, April 4, 2003, at 4-5.) The District Court agreed with the Commonwealth's argument in part. It held that

> [t]he prejudice of individual <u>Parole</u> Board members is irrelevant, as Plaintiffs must establish that the amendments would not be valid under any set of circumstances. . . . Plaintiffs may still pursue the argument that the inclusion of a crime victim on the Board impermissibly introduces decision-maker bias into the <u>parole</u> process.

(Mem. Op., May 6, 2003 at 7) (emphases added).[6]

On August 19, 2005, Plaintiffs filed a Motion for Summary Judgment. It was refiled on August 23, 2005 as an Amended Motion for Summary Judgment, pursuant to the District Court's instruction. Plaintiffs moved for summary judgment as to Count II on the ground that the 1997 Amendment

---

[6]Neither party addressed Rule 12(b)(1) in any of the papers filed in connection with the Commonwealth's motion to dismiss or in the parties' cross-motions for reconsideration. The District Court also did not discuss Rule 12(b)(1) in denying the Commonwealth's motion or in ruling on the parties' cross-motions for reconsideration.

19

"constitutes an improper *ex post facto* imposition of additional punishment in violation of the United States Constitution on persons who were sentenced to death or to life in prison prior to the effective date of such Amendment." (Pls.' Am. Mem. in Supp. of Their Mot. for Summ. J., Aug. 23, 2005.)

On September 13, 2005, the Commonwealth filed a Motion for Summary Judgment as to Plaintiffs' challenge to the inclusion of a crime victim on the Board of Pardons on the ground that it impermissibly introduced decision-maker bias into the clemency process in violation of the Due Process Clause. The Commonwealth also moved for summary judgment as to Plaintiffs' *ex post facto* claim, on the ground that Plaintiffs had "failed to show that the application of the Amendment will result in a longer period of incarceration for life-sentenced inmates [and they have not shown] that they themselves were individually disadvantaged by the Amendment." (Defs.' Br. in Supp. of Their Mot. Summ. J., at 23.)

On March 13, 2006, the District Court granted the Plaintiffs' Motion for Summary Judgment, holding that the new requirement of Board unanimity in recommending pardons for prisoners sentenced to life imprisonment who had committed their crimes before the 1997 Amendment's effective date violated the *Ex Post Facto* Clause. The District Court denied relief in all other respects. *Pa. Prison Soc'y v. Rendell*, 419 F. Supp. 2d 651, 662 (M.D. Pa. 2006).

The parties filed a timely appeal and cross-appeal to this

20

Court. The Commonwealth argued that the District Court erred in failing to dismiss or, alternatively, to grant their motion for summary judgment on the *ex post facto* claim. *Prison Society I*, 508 F.3d at 160 n.6. The Commonwealth also argued, for the first time on appeal, that both the District Court and this Court lacked jurisdiction over Plaintiffs' claims because none of the Plaintiffs had standing under Article III of the U.S. Constitution. *Id.* at 169. This Court agreed that Plaintiffs' pleadings failed to allege facts demonstrating that they met the requirements for standing. *Id.* at 162-164 (organizational plaintiffs); 164 (voter/taxpayer plaintiffs); 164-169 (prisoner plaintiffs). This Court concluded that:

> Because the issue of standing was raised for the first time on appeal, none of the plaintiffs have had the opportunity to present evidence or to litigate this issue. We will therefore dismiss this appeal without prejudice for lack of jurisdiction and remand to the District Court for further proceedings consistent with this Opinion to develop the record in order to determine plaintiffs' standing to bring this action.

*Id.* at 169. Based upon the conclusion that the Plaintiffs lacked standing, this Court did not reach the Commonwealth's argument that the District Court erred in failing to dismiss this action or, alternatively, grant summary judgment to the Commonwealth on the *ex post facto* claim. The Commonwealth's appeal was dismissed and the case was

21

remanded to the District Court so that the Plaintiffs could present evidence or otherwise litigate the standing issue.

On remand, the District Court held an evidentiary hearing regarding the standing issue as to each plaintiff on June 2, 2008, August 6, 2008, and August 7, 2008. The District Court determined that the Pennsylvania Prison Society was the only plaintiff that "satisfie[d] all of the requirements needed to qualify for the organizational exception to the prohibition on third party standing." *Pa. Prison Soc'y v. Cortés*, 2009 U.S. Dist. LEXIS 48995 *4 (M.D. Pa. June 11, 2009). The District Court also concluded that none of the remaining individual prisoner plaintiffs had standing "because they have not suffered or shown that they will imminently suffer an injury resulting from the 1997 Amendments to the Pennsylvania Constitution."[7] *Id*. at *3. The District Court also denied a motion to intervene filed by prisoners Keith Smith and Jackie Lee Thompson, concluding that their "interests are adequately represented by . . . the Pennsylvania Prison Society." *Id*.

In its June 11, 2009 Memorandum Opinion, the District Court "reinstate[d]" its prior rulings on the Cross-motions for Summary Judgment filed by the parties in 2005 (Plaintiffs' motion filed August 23, 2005 and the Commonwealth's motion filed September 13, 2005). *Id*. at *49 (citing Mem. and Order,

---

[7]Plaintiffs Roger Buehl, Douglas Hollis, and Vincent Johnson were the only individual prisoner plaintiffs remaining in the suit at the time of the District Court's ruling.

22

March 13, 2006, reported at *Pa. Prison Soc'y v. Rendell*, 419 F. Supp. 2d at 659, 661). In its March 13, 2006 Memorandum Opinion, the District Court concluded that the 1997 Amendment violates the *Ex Post Facto* Clause because retrospective application of the 1997 Amendment "clearly disadvantage[s] the applicants . . . [because its] change in voting requirements, from majority to unanimity, creates more than a speculative and attenuated risk of increasing the measure of punishment applied to life sentenced inmates." *Pa. Prison Soc'y*, 419 F. Supp. 2d at 661-62. The District Court considered evidence drawn from the new law's practical implementation, i.e., an analysis of the parties' stipulated rate and frequency of commutations granted to life-sentenced inmates in Pennsylvania between 1970 and 2005. It concluded that, as applied to those inmates sentenced after its effective date, the 1997 Amendment posed a "significant risk" of increased punishment. *Id.* at 658, 660-61 n.1 & n.2. Based upon its finding that "the total number of recommendations by the Board for commutation for life sentenced prisoners [was] significantly lower than the number of recommendations in the eight years prior to the [1997 A]mendments' passage," the District Court held that

> even though a less than unanimous vote did not guarantee a life sentenced prisoner commutation prior to the passage of the 1997 amendments and although commutation is not completely foreclosed following the passage of the amendments, the 1997 amendments significantly

23

reduced the likelihood of a life sentenced prisoner receiving a recommendation by the Board for commutation and, as such, the 1997 amendments make commutations and parole even more remote for those inmates.

*Id*. at 660-61.

The Board of Pardons and the Pennsylvania Prison Society, as well as Hollis, Smith, and Thompson filed timely cross-appeals from the District Court's final order of June 11, 2009.

The District Court asserted jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1441(a). This Court has jurisdiction over the appeal from the District Court's final order pursuant to 28 U.S.C. § 1291.

Two dispositive issues remain in this protracted litigation. We must decide whether the District Court was required to conduct an evidentiary hearing to determine its subject matter jurisdiction over the *ex post facto* claim of each Plaintiff, pursuant to this Court's mandate in *Prison Soc'y I*. We must also address the question whether the 1997 Amendment, which concerns the exercise of a Governor's sovereign power of clemency as authorized by a state's voters, violates the *Ex Post Facto* Clause.

## II

In *Prison Soc'y I*, this Court declined to reach the merits

24

of the parties' cross-appeals from the District Court's order on the parties' Cross-Motions for Summary Judgment because the Second Amended Complaint did not demonstrate that any of the Plaintiffs had standing to assert their constitutional claims. For that reason, this Court dismissed the Commonwealth's appeal without prejudice, without reaching the merits of the cross-appeals and instructed the District Court to "develop the record in order to determine plaintiffs' standing to bring this action." *Prison Soc'y I*, 508 F.3d at 169.

**A**

The Board of Pardons argues that the District Court erred in permitting the Pennsylvania Prison Society to present evidence on the issue of its organizational standing because "[t]his Court's prior ruling in this case[, which] determined . . . that PPS, and all of the other organizational plaintiffs had failed to show standing," foreclosed further review of the issue by the District Court. (Appellants' Opening Br. 5.) Based upon the District Court's reading of this Court's opinion in *Prison Soc'y I*, it determined that the instruction upon remand was for it "to develop the record and determine standing for all plaintiffs in the current case, including the Pennsylvania Prison Society." *Pa. Prison Soc'y v. Cortés*, 2009 U.S. Dist. LEXIS 48995 at *38-39 (emphasis added). The District Court based its conclusion upon the fact that this Court "did not specify certain individuals or classes of Plaintiffs" in its remand order who should be allowed to present evidence of their standing to present their claims to the District Court. *Id.* at *38. We are

25

persuaded that the District Court did not err in complying with this Court's mandate that it determine the standing of each plaintiff before it could consider the merits of their constitutional claims.

**B**

The Board of Pardons also argues that the District Court erred in concluding that the Pennsylvania Prison Society had organizational standing to bring this suit because its ruling was based upon the erroneous conclusion that individual members Keith Smith and Jackie Lee Thompson had standing to sue in their own right. The Board of Pardons argues that Smith and Thompson lacked standing because they "do not have live claims as their ability to challenge the 1997 amendments is time-barred." (Appellants' Reply Br. 8-9.) "We exercise plenary review of standing . . . issues, but review for clear error the factual elements underlying the District Court's determination of standing." *General Instrument Corp. v. Nu-Tek Elecs. & Mfg.*, 197 F.3d 83, 86 (3d Cir. 1999).

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

26

decision.

*Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  When plaintiffs allege a future injury, that injury must be "certainly impending," not an injury that will only occur at "some indefinite future time." *Lujan*, 504 U.S. at 564 n.2.  "'[S]ome day' intentions — without any description of concrete plans, or indeed even any specification of *when* the some day will be — do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* at 564.  This requirement assures that "there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974).

> [A]n association has standing to bring suit on behalf of its members when; (a) its members would otherwise have standing to sue in their own right; (b) the interests at stake are germane to the organization's purpose, and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).  Importantly, the organization must "make specific allegations establishing that at least one identified member ha[s] suffered or would suffer harm." *Summers v.*

27

*Earth Island Inst.*, 129 S. Ct. 1142, 1151 (2009).

In *Prison Soc'y I*, this Court concluded that "the record [wa]s silent about the organizational plaintiffs' members and whether those members themselves meet the standing requirements to bring this case." *Prison Soc'y I,* 508 F.3d at 163. Upon remand, following months of discovery and three days of evidentiary hearings, the District Court found that "the evidence clearly shows that the Pennsylvania Prison Society satisfies all of the requirements needed to qualify for the organizational exception to the prohibition on third party standing and may pursue relief on behalf of its members." *Pa. Prison Soc'y v. Cortés*, 2009 U.S. Dist. LEXIS 48995 at *43.

Applying the test for organizational standing set forth in *Hunt*, the District Court found that the Pennsylvania Prison Society had presented evidence that Smith and Thompson were both members and had both received four-to-one (4-1) Board of Pardons votes in favor of their application for a commutation after the 1997 Amendment took effect. *Id*. at *40. Accordingly, it concluded that Thompson and Smith had standing to bring a constitutional challenge to the 1997 Amendment in his own right. *Id*.

The Board of Pardons' argument that Smith and Thompson lacked standing to bring this action because they failed to challenge the Board of Pardons' denial of their prior applications within the prescribed time frame for bringing such challenges is not persuasive. (Appellants' Opening Br. 27-28.)

28

The Board of Pardons has cited no authority, and we have found none, holding that an *ex post facto* challenge to a constitutional amendment must be brought within a given time period or else it is forfeited. Moreover, the Pennsylvania Prison Society is not seeking damages for past injuries. It is seeking declaratory relief and an injunction. The Pennsylvania Prison Society has alleged that Smith and Thompson have suffered an "injury-in-fact" due to "imminent" future harm in connection with their current and future applications for commutations, which is sufficient for purposes of demonstrating standing to bring this action. Smith testified before the District Court that he filed an application in 2007 that is currently "at a standstill because of the issue here. They said . . . that they [were] not moving any applications until . . . this situation is resolved." (J.A. 642.) Thompson testified that he is "working on" a new application for commutation that he intends to submit as soon as he clears up an administrative obstacle pertaining to his Social Security number. (Cross-Appellants' Br. 33.) The Board of Pardons has not demonstrated that Thompson and Smith are likely to receive less favorable votes from the Board of Pardons than the four-to-one votes they received the last time their applications were reviewed by the Board of Pardons. For purposes of establishing the District Court's subject matter jurisdiction to consider their complaint that their constitutional rights had been violated, Smith and Thompson's allegations were sufficient to withstand a dismissal of their claims pursuant to Rule 12(b)(1).

We agree with the District Court's conclusion that the

29

Pennsylvania Prison Society satisfied the second prong of the *Hunt* test for organizational standing because it presented evidence that "the interests that the Pennsylvania Prison Society now seeks to assert are certainly germane to the Prison Society's purpose, <u>as stated in the Second Amended Complaint</u>, [which is] 'to advocate for a humane, just, and restorative correctional system, and to promote a rational approach to criminal justice issues.'" *Pa. Prison Soc'y v. Cortés*, 2009 U.S. Dist. LEXIS 48995 at *43 (citing 2d Amend Compl. ¶ 5) (emphasis added). The constitutionality of the commutations process is an interest that is "germane to the organization's purpose." *Hunt*, 432 U.S. at 343. The Prison Society has advocated for Pennsylvania's prisoner population since 1787. (2d Amend Compl. ¶ 5-9.) As the Second Amended Complaint explained, the Prison Society is concerned with promoting "a humane, just, and restorative correctional system" and "a rational approach to criminal justice issues." (*Id*.)

Finally, the District Court concluded that the Prison Society satisfied the third prong of the *Hunt* organizational standing test because "[n]either the claim asserted [n]or the relief requested [in the Second Amended Complaint] requires the participation of individual Prison Society members in the lawsuit since this suit alleges that the 1997 Amendments to the Pennsylvania Constitution impact several life-sentenced prisoners in Pennsylvania and violate the *Ex Post Facto* Clause of the United States Constitution." *Pa. Prison Soc'y v. Cortés*, 2009 U.S. Dist. LEXIS 48995 at *93. The District Court

30

correctly determined that the Pennsylvania Prison Society "satisfie[d] the so-called 'organizational exception' to the prohibition on third party standing and that the Prison Society's standing to bring this action on behalf of its members is appropriate regardless of Mr. Smith and Mr. Thompson's attempted intervention in this case." *Id*. at *42. As an organization, the Pennsylvania Prison Society is entitled to challenge the constitutionality of the 1997 Amendment and pursue related prospective relief on behalf of its members.

The District Court did not err in concluding that the Pennsylvania Prison Society had organizational standing to represent its members who are prisoners sentenced to life imprisonment. *See Hunt*, 432 U.S. at 343 (setting forth factors an association must show to demonstrate that it has standing to bring suit on behalf of its members).

## C

Douglas Hollis argues in his cross-appeal that the District Court erred in concluding that he "lacked standing because he did not show a likelihood of receiving a majority vote in his pending petition for commutation, although he possesses the characteristics of lifers previously recommended for commutation, he previously received a majority vote, and he has a petition pending with the Board." (Appellees/Cross-Appellants' Br. at 8.) Hollis asserts that the District Court's conclusion that he lacked standing to participate in this action is irreconcilable with its holding that Smith and Thompson had

31

demonstrated standing to sue in their own right. *Id*. Hollis argues that because he, like Smith and Thompson, received a favorable four-to-one majority vote by the Board of Pardons in a past application for commutation, and he has a pending application for commutation, he has shown an injury-in-fact due to imminent future harm sufficient to sue in his own right. The Board of Pardons maintains that the District Court based its ruling on findings of fact that were supported by the evidence, and thus should not be disturbed by this Court unless they are clearly erroneous. (Appellants' Reply Br. 18.)

The District Court concluded that Hollis had not demonstrated that he was "likely to receive a majority vote in favor of review on the application currently pending before the Board of Pardons." *Pa. Prison Soc'y v. Cortés*, 2009 U.S. Dist. LEXIS 48995 at *30. This conclusion was based upon the District Court's finding that in Hollis's most recent application, filed in 1994, he received an unfavorable one-to-four vote against recommendation to the Governor. *Id*. at *24, 30. The District Court appears to have rejected Hollis's explanation that the reason he received a one-to-four vote was because his

> hearing was held immediately in the aftermath of the emotionally charged atmosphere of the November 1994 Gubernatorial election, wherein Lieutenant Governor Singel had lost to Governor Ridge, in part based upon Singel's recommendation to commute the life sentence of Reginald McFadden, who turned around and

32

committed a murder and rape in New York less than a year after he got out.

*Id*. at *25. The Board of Pardons argues that, based upon the trend developed in the statistical evidence presented concerning the history of recommended commutations, Hollis would not have received a recommendation for commutation because the trend did not favor the exercise of clemency in Hollis' case. *Id*. at 27-31. The District Court concluded that "both Mr. Hollis' personal commutation application history, along with the general commutations review 'trends' identified by the Defendants, show that the injury claimed by Mr. Hollis is, at this time, speculative." *Id*. at *30-31.

Hollis argues in his cross-appeal that the District Court's ruling, and this Court's earlier instruction that a plaintiff must show that he is "likely to receive a majority of votes favoring a commutation recommendation from the Board," *Pa. Prison Society I*, 508 F.3d at 165, is inconsistent with the Supreme Court's holdings in *Summers v. Earth Island Inst*., 129 S. Ct. 1142 (2009), and *Adarand Constructors v. Pena*, 515 U.S. 200 (1995). (Cross-Appellants' Br. 75-78.) Hollis argues that these cases stand for the proposition that it is unnecessary to show the actual outcome of future conduct to establish standing, i.e., that the lifers here are not required to show that they would again receive a favorable four-to-one Board vote recommending commutation to have standing. (*Id*.) Rather, Hollis contends that "the lifers here must [only] demonstrate that they have definite plans to apply for commutation in the near future or

33

have an application currently pending." (*Id*. at 78.)

The District Court held that Hollis had alleged only "a potential injury, happening on some indeterminate future date [that] is neither concrete nor particularized nor imminent, and [thus] does not satisfy the 'irreducible constitutional minimum' of standing established by Article III." *Pa. Prison Soc'y v. Cortés*, 2009 U.S. Dist. LEXIS 48995 at *30 (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)) (internal quotations omitted). "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson,* 470 U.S. at 573. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969). The Court explained in *Anderson*:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as

34

> the trier of fact, it would have weighed the
> evidence differently. Where there are two
> permissible views of the evidence, the factfinder's
> choice between them cannot be clearly erroneous.

*Id*. (citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949)). We are persuaded that the District Court did not clearly err in finding that Hollis lacked individual standing to participate in this action. We also note that Hollis is a member of the Pennsylvania Prison Society and that his interests are duly represented by the Prison Society, notwithstanding the District Court's ruling that he lacked individual standing.

**D**

Keith Smith and Jackie Lee Thompson cross-appeal from the District Court denial of their motion to intervene in this action. The District Court construed Smith and Thompson's motion to intervene as a motion for permissive intervention and denied it based upon the discretion provided to district courts pursuant to Fed. R. Civ. P. 24(b). *Pa. Prison Soc'y v. Cortés*, 2009 U.S. Dist. LEXIS 48995 at *45-48. Smith and Thompson argue that the District Court should have construed the motion as a request to intervene as of right based upon Fed. R. Civ. P. 24(a). We review a district court's ruling on a motion to intervene for abuse of discretion. *Kleissler v. United States Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998). This Court will reverse such a matter only if we conclude that the trial "court has abused its discretion by applying an improper legal standard

35

or reaching a conclusion we are confident is incorrect." *Id*.

Rule 24 (a) of the Federal Rules of Civil Procedure provides that, "[o]n timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a). Rule 24 (b) provides in relevant part that "[o]n timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). Furthermore, "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Id*.

The District Court concluded

(1) that the interests of Mr. Smith and Mr. Thompson are adequately represented by the Pennsylvania Prison Society and (2) that their intervention into this case, after this Court's grant of summary judgment and the Court of Appeals' remand, would be purely superfluous and add unnecessary complexities that could potentially

36

cause undue delay in the resolution of this case.

*Pa. Prison Soc'y v. Cortés*, 2009 U.S. Dist. LEXIS 48995 at *48. The District Court further found that there was no evidence that the Pennsylvania Prison Society had not been diligent in prosecuting this action on behalf of its members. *Id*. at *47. None of the arguments proffered by Smith and Thompson in their cross-appeal demonstrates that their interests have not been adequately represented by the Pennsylvania Prison Society. The District Court did not abuse its discretion in denying Smith and Thompson's motion to intervene.

Accordingly, based upon its conclusion that the Pennsylvania Prison Society had standing to bring this action, the District Court properly "assume[d] jurisdiction to decide whether the allegations [in the second amended complaint] state a cause of action on which the court can grant relief as well as to determine issues of fact arising in the controversy" with respect to Plaintiffs' *ex post facto* claim. *Bell v. Hood*, 327 U.S. 678, 682 (1946).

### III

The Board of Pardons argues in this appeal, as did the Commonwealth in *Prison Soc'y I*, that the District Court erred in granting summary judgment in favor of the Pennsylvania Prison Society because "the changes to Pennsylvania pardons procedures made by the 1997 constitutional amendments did not truly implicate the *Ex Post Facto* Clause." (Appellants' Br. 29.) It maintains that this Court should "reverse [the District Court's]

37

rulings and . . . remand this case to the district court with directions either to dismiss this matter or to enter judgment in their favor, as may be appropriate given the resolution of the legal issues." (*Id*. at 4.)  In urging this Court to remand this matter with directions that it be dismissed, the Board of Pardons argues that "[t]he district court misapprehended critical characteristics of commutations/pardons in Pennsylvania, which compel the conclusion that the 1997 changes to voting procedures do not fit the definition of "*ex post facto*." (*Id*. at 5.)

We are persuaded that the District Court erred as a matter of law in denying the Commonwealth's motion to dismiss Plaintiffs' *ex post facto* claim pursuant to Fed. R. Civ. P. 12(b)(6) because the Prison Society has not stated a viable *ex post facto* claim.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In deciding a motion to dismiss, a court must determine whether the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 1950.

Plaintiffs allege in the Second Amended Complaint that

38

"[t]he changes in the pardons process effectuated by the Amendment impose additional punishment on the Prisoner Plaintiffs since there is distinctly less of an opportunity to obtain a pardon or commutation." (2d Amend Compl. ¶ 44.) Plaintiffs also allege that "[p]rior to the Amendment, it was distinctly more likely that the Prisoner Plaintiffs could obtain a pardon or commutation. However, since the Amendment became law, the Prisoner Plaintiffs are virtually shut out from that opportunity." (2d Amend Compl. ¶ 65.) These allegations fail to state a viable claim as a matter of law because the legal conclusion that the "Amendment impose[s] additional punishment" is not supported by any of the factual allegations in the Second Amended Complaint. The 1997 Amendment does not lengthen the sentences imposed upon the prisoners represented by the Pennsylvania Prison Society, who have been sentenced to serve a term of life imprisonment without parole.

"There is no *ex post facto* violation where the retroactively applied law does not make one's punishment more burdensome, but merely creates a disadvantage." *Spuck v. Ridge*, 347 F. App'x 727, 729 (3d Cir. 2009) (affirming the district court's dismissal of *ex post fact claim* where plaintiff's sentence was not lengthened or made more severe by the new guidelines which made furlough opportunities unavailable because that did not make the punishment more onerous) (citing *Hameen v. Delaware*, 212 F.3d 226, 236 (3d Cir. 2000)).

While the District Court correctly determined that the Pennsylvania Prison Society had standing to bring this action, in

39

ruling on the Commonwealth's Rule 12(b)(6) motion to dismiss, it erroneously concluded that Plaintiffs had alleged facts sufficient to demonstrate that the 1997 Amendment could result in a longer period of incarceration for inmates sentenced prior to its adoption. (Mem. Order Den. Defs.' Mot. to Dismiss, March 6, 2003, at 11-12.) For this same reason, we must also reverse the District Court's order granting summary judgment in favor of the Pennsylvania Prison Society.

As the Commonwealth has argued throughout this litigation, there are three distinct reasons why Plaintiffs' *ex post facto* claim is not viable.[8] First, the 1997 Amendment is not an *ex post facto* law "[g]iven the *ad hoc* nature of [executive] clemency, the retroactive application of the amendment cannot, as a matter of law, have any widespread effect on the period of incarceration for prisoners serving life sentences. . . ." (Defs.' Reply in Supp. of Their Mot. to Dismiss 9 (quoting *Solem v. Helm*, 463 U.S. 277, 300-301 (1983) (citing *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458 (1981).)

Second, "[P]laintiffs *cannot* show that the passage of the

---

[8]In *Prison Soc'y I*, this Court did not reach the merits of the Commonwealth's contention that the District Court erred in denying its Rule 12(b)(6) motion, and in granting the Plaintiffs' motion for summary judgment for violation of the *Ex Post Facto* Clause, because the Plaintiffs failed to present any evidence of a significant injury to satisfy the jurisdictional requirement of demonstrating the existence of a case or controversy.

Amendment has resulted or will result in a longer period of incarceration for life sentenced prisoners" because a life sentence, absent the executive grant of a commutation, is still a life sentence and nothing more. (Defs.' Mem. in Supp. of Their Mot. for Summ. J. 20 (emphasis added); *see also* Appellants' Op. Br. 31 (citing *Commonwealth v. Szczesniewski*, 591 A.2d 1055, 1056 (Pa. Super. 1991) (holding that in Pennsylvania a term of life imprisonment is no less than and no more than natural life)); 61 P.S § 331.21(a) (Parole is not a possibility for life- or death- sentenced prisoners).) The adoption of the 1997 Amendment did not increase the punishment. A term of life imprisonment is no less than and no more than natural life.

Third, the 1997 Amendment does not trigger an *ex post facto* inquiry because changes in the law that alter procedures for obtaining commutation, but do not eliminate the possibility of commutation, are procedural and thus not *ex post facto* laws. (Appellants' Br. 11, 29 (citing *Artway v. Attorney Gen. of N.J.*, 81 F.3d 1235, 1253 (3d Cir. 1996)).)

We will first address the requirements for triggering an *ex post facto* inquiry when challenging a law that is violative of the *Ex Post Facto* Clause. We will then address the arguments concerning the deficiencies in Plaintiffs' *ex post facto* claim raised by the Commonwealth in its motion to dismiss, and before this Court in *Prison Soc'y I*, and by the Board of Pardons in the instant appeal.

**A**

41

The *Ex Post Facto* Clause of the Constitution, U.S. Const. art. I §§ 9 and 10, forbids the government from passing any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver*, 450 U.S. 24, 28 (1981) (internal quotation omitted). The *Ex Post Facto* Clause is intended to provide fair warning about new punishments and to discourage arbitrary and oppressive legislation. *Weaver*, 450 U.S. at 28. To fall within the *ex post facto* prohibition, "two critical elements must be present . . . : it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Id*. at 29 (footnotes omitted).

In *Lindsey v. Washington*, the Supreme Court explained that, in reviewing a claim of an *ex post facto* violation, the focus is on the "effect" of the new law. *Lindsey,* 301 U.S. at 400. In *Lindsey*, at the time petitioners were convicted of grand larceny, that crime was punishable by a maximum sentence of "not more than fifteen years," and a minimum sentence to be fixed by the court in its discretion at some point between six months and five years, after which time petitioners were eligible for parole. *Id*. After petitioners committed their offense, but before they were sentenced, Washington enacted a new state law that made the maximum sentence provided by law *mandatory*, for those felonies carrying maximum sentences. *Id*. Petitioners challenged the new law in state court. The Supreme Court of Washington sustained the sentence. *Id*. at 399. The Supreme

Court reversed.  It held as follows:

> [T]he Supreme Court of Washington, without analysis or comparison of the practical operation of the [new and old] statutes, [upheld the law, declaring that] "[t]he amending act [did] not change or inflict a greater punishment than the law in force when the alleged crime was committed[,] for the court could under the law in force at that time pronounce a maximum sentence of not more than fifteen years.  The minimum and maximum punishments remain the same as before the enactment of the act of 1935."

*Id*. at 399-400.  The Court explained that "[t]he effect of the new statute is to make mandatory what was before only the maximum sentence."  *Id*. at 400.  The Court reasoned as follows:

> Removal of the possibility of a sentence of less than fifteen years . . . operates to [the] detriment [of petitioners] in the sense that the standard of punishment adopted by the new statute is more onerous than that of the old.  It could hardly be thought that, if a punishment for murder of life imprisonment or death were changed to death alone, the latter penalty could be applied to homicide committed before the change. Yet this is only a more striking instance of the detriment

43

which ensues from the revision of a statute providing for a maximum and minimum punishment by making the maximum compulsory. . . . It is plainly to the substantial disadvantage of petitioners to be deprived of all opportunity to receive a sentence which would give them freedom from custody and control prior to the expiration of the fifteen-year term.

*Id*. at 401-02 (citation omitted).

In *Weaver*, the Supreme Court similarly held that a Florida law which, "[o]n its face, reduce[d] the number of monthly gain-time credits available to an inmate who abides by prison rules and adequately performs his assigned tasks," violated the *Ex Post Facto* Clause because "[b]y definition, this reduction in gain-time accumulation lengthens the period that someone in petitioner's position must spend in prison." *Weaver*, 450 U.S. at 31. The Court noted that "a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." *Id*. at 32 (citing *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974)). The Court explained its conclusion as follows:

> Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond

44

what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense.

*Id*. at 30-31. Citing *Lindsey,* the Court concluded that the petitioner in *Weaver* "[was] similarly disadvantaged by the reduced opportunity to shorten his time in prison simply through good conduct." *Id*. at 33-34.

Conversely, in *Dobbert v. Florida*, the Supreme Court reviewed a "new statute . . . [that] altered the methods employed in determining whether the death penalty was to be imposed," and concluded that there was no *ex post facto* violation because though the challenged provisions changed the role of jury and judge in sentencing, they did not add to the "quantum of punishment." *Dobbert v. Florida*, 432 U.S. 282, 293-94 (1977). "[E]ven if a law operates to the defendant's detriment, the *ex post facto* prohibition does not restrict 'legislative control of remedies and modes of procedure which do not affect matters of substance.'" *Miller v. Florida*, 482 U.S. 423, 433 (1987) (quoting *Dobbert*, 432 U.S. at 293). "Hence, no *ex post facto* violation occurs if the change in the law is merely procedural and does 'not increase the punishment, nor change the ingredients of the offen[s]e or the ultimate facts necessary to establish guilt.'" *Id*. (quoting *Hopt v. Utah*, 110 U.S. 574, 590 (1884)). "On the other hand, a change in the law that alters a

45

substantial right can be *ex post facto* 'even if the statute takes a seemingly procedural form.'" *Id*. (quoting *Weaver*, 450 U.S., at 29, n. 12).

In *Cal. Dep't of Corr. v. Morales*, the Supreme Court considered whether a law changing the procedures concerning the accessibility of parole suitability hearings violated the *Ex Post Factor* Clause. *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499 (1995). Morales filed a federal habeas corpus petition asserting that an amendment to California's parole procedures that allowed the California Board of Prison Terms to decrease the frequency of parole suitability hearings under certain circumstances constituted an *ex post facto* law barred by the United States Constitution.[9] The district court denied the petition. The Ninth Circuit Court of Appeals reversed, however,

---

[9]Morales was convicted of murdering his wife while he was out on parole for having committed a prior murder. Under the law in place at the time he committed his second murder, Morales would have been entitled to parole suitability hearings on an annual basis. *Morales*, 514 U.S. at 503 (citation omitted). After his second murder conviction, the California Legislature authorized the California Board of Prison Terms to defer subsequent suitability hearings for up to three years if the prisoner has been convicted of "'more than one offense which involves the taking of a life' and if the Board 'finds that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding.'" *Id*. (quoting Cal. Penal Code Ann. § 3041.5(b)(2) (West 1982)).

holding that the retrospective law made a parole hearing less accessible to respondent and thus effectively increased his sentence in violation of the *Ex Post Facto* Clause. The California Department of Corrections filed a petition for *certiorari* before the Supreme Court, and it was granted.

Morales argued before the Court that the new law increased the punishment attached to his crime because, under *Lindsey*, *Miller*, and *Weaver*, "a legislature may not stiffen the 'standard of punishment' applicable to crimes that have already been committed." *Morales*, 514 U.S. at 505 (citations omitted). The Supreme Court disagreed. It held that the new law did not violate the *Ex Post Facto* Clause because

> the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' nor . . . on whether an amendment affects a prisoner's 'opportunity to take advantage of provisions for early release,' but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable.

*Id.* at 499, 506 n.3 (citation omitted) (emphasis added). The Court distinguished *Lindsey*, *Miller*, and *Weaver*, explaining that:

> Both before and after the [new law], California punished the offense of second-degree murder

47

with an indeterminate sentence of "confinement in the state prison for a term of 15 years to life." The amendment also left unchanged the substantive formula for securing any reductions to this sentencing range. Thus, although 15 years was the formal "minimum" term of confinement, respondent was able to secure a one-third "credit" or reduction in this minimum by complying with prison rules and regulations. The amendment had no effect on the standards for fixing a prisoner's initial date of "eligibility" for parole, or for determining his "suitability" for parole and setting his release date.

*Id*. at 507 (citations omitted). The Court also rejected Morales's argument that "the *Ex Post Facto* Clause forbids any legislative change that has any conceivable risk of affecting a prisoner's punishment . . . [where] there is 'no principled way to determine how significant a risk of enhanced confinement is to be tolerated.'" *Id*. at 508 (quoting Brief for Respondent 39). In rejecting Morales's expansive view of the *Ex Post Facto* Clause, the Court explained that adopting this contention

would require that we invalidate any of a number of minor (and perhaps inevitable) mechanical changes that might produce some remote risk of impact on a prisoner's expected term of confinement [ . . . and charge the judiciary . . . ] with the micromanagement of an endless array of

48

> legislative adjustments to parole and sentencing
> procedures, including such innocuous adjustments
> as changes to the membership of the Board of
> Prison Terms, restrictions on the hours that
> prisoners may use the prison law library,
> reductions in the duration of the parole hearing,
> restrictions on the time allotted for a convicted
> defendant's right of allocution before a sentencing
> judge, and page limitations on a defendant's
> objections to presentence reports or on documents
> seeking a pardon from the governor.

*Id*. at 508-09. The Court stated that while "[t]hese and countless other changes might create some speculative, attenuated risk of affecting a prisoner's actual term of confinement by making it more difficult for him to make a persuasive case for early release, . . . that fact alone cannot end the matter for *ex post facto* purposes." *Id.* at 508-09.

In *Garner v. Jones*, 529 U.S. 244 (2000), the Supreme Court considered whether an amendment to a Georgia rule that changed parole reconsideration review procedures violated the *Ex Post Facto* Clause. *Id*. at 246. Jones was convicted of murder and sentenced in 1974 to a term of life in prison. *Id.* at 247. Having escaped and committed a second murder, Jones was again convicted and sentenced to life in prison in 1982. *Id*. Under Georgia law in effect at the time of Jones's second offense, the state's Board of Pardons and Paroles was required to consider inmates serving life sentences for parole after seven

49

years, and if not granted, every three years thereafter. *Id.* (citing Ga. Code Ann. § 42-9-45(b) (1982)). "After Jones was incarcerated but before he was initially considered for parole, the Board [of Pardons] amended its rules to require that parole reconsideration take place only once every eight years." *Jones v. Garner*, 164 F.3d 589, 590 (11th Cir. 1999) (citing Ga. Comp. R. & Regs. r. 475-3-.05.(2) n.1).

Jones brought an action under 42 U.S.C. § 1983, claiming, *inter alia*, that the amendment to Rule 475-3-.05(2) violated the *Ex Post Facto* Clause. *Id.* The suit was filed against individual members of the Parole Board. The district court granted summary judgment in favor of the Parole Board on the ground that the amendment to Rule 475-3-.05(2) "change[d] only the timing between reconsideration hearings for inmates sentenced to life in prison, thereby relieving the Board of the necessity of holding parole hearings for prisoners who have no reasonable chance of being released." *Garner*, 529 U.S. at 248 (quotation omitted). The Eleventh Circuit reversed, holding that retroactive application of the amended Georgia Rule differed in material respects from the California law sustained in *Morales* because it "seems certain" to result in some prisoners serving extended periods of incarceration. *Jones*, 164 F.3d at 589; *Garner*, 529 U.S. at 248-49. As such, the Eleventh Circuit held that the amended Georgia Rule violated the *Ex Post Facto* Clause. *Jones*, 164 F.3d at 595.

The Supreme Court reversed, explaining that "the standard announced in *Morales* requires a more rigorous

50

analysis of the level of risk created by the change in law." *Garner*, 529 U.S. at 255.

> When the rule does not by its own terms show a significant risk, the respondent must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule.

*Id*. Because Jones had not shown "that as applied to his own sentence the law created a significant risk of increasing his punishment," the Supreme Court remanded the case to the district court to determine "whether retroactive application of the amendment to Rule 475-3-.05(2) increases, to a significant degree, the likelihood or probability of prolonging [Jones's] incarceration." *Id*. at 255-56.

It is thus clear from the Supreme Court cases that have reviewed legislative changes affecting <u>parole</u> decisions that, to demonstrate an *ex post facto* claim, a plaintiff must show that the effect of a retroactive change in the law or policy created a "significant risk" that the sentence ultimately served will be increased above and beyond what was prescribed when the crime was consummated, as a result of the new law. Allegations that changes in the law have produced "some ambiguous sort of 'disadvantage,' [or] . . . affect[ed] a prisoner's '*opportunity* to take advantage of provisions for early release,'" are not

51

sufficient grounds for bringing an *ex post facto* claim. *Morales*, 514 U.S. at 506 n.3 (citations omitted). With these parameters in mind, we will address the Board of Pardons' arguments concerning the viability of Pennsylvania Prison Society's *ex post facto* claim.

**1**

In granting the Plaintiffs' Motion for Summary Judgment on the *ex post facto* claim, in its March 13, 2006 memorandum opinion, the District Court reasoned as follows:

> [T]he 1997 amendment[']s change in voting requirements, from majority to unanimity, creates more than a speculative and attenuated risk of increasing the measure of punishment applied to life sentenced inmates. Further, the requirement of convincing all, rather than a majority, of the Board members that commutation is warranted is a more difficult task for any applicant, and will equally disadvantage every applicant to which the amendment is applied. As such, Plaintiffs have offered evidence sufficient to demonstrate individual disadvantage as required by the Third Circuit in *Richardson*.

*Pa. Prison Soc'y v. Rendell*, 419 F. Supp. 2d at 662 (citation omitted).

The Board of Pardons argued in its motion to dismiss,

52

and throughout this litigation, that Plaintiffs have failed to state an *ex post facto* claim because, "in Pennsylvania, clemency is a process separate and apart from criminal case due process and involves a matter of executive — not judicial — grace." (Appellant's Op. Br. 17.) The Board of Pardons asserts that "[c]ommutation . . . is an *ad hoc* exercise of executive clemency. A Governor may commute a sentence at any time for any reason without reference to any standards." (Defs.' Reply in Supp. of Their Mot. to Dismiss 9 (quoting *Solem*, 463 U.S. at 300-01 (citing *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458 (1981))).)

The 1997 Amendment concerns a change in procedures required for seeking commutation from the Governor. "Unlike probation, pardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." *Dumschat*, 452 U.S. at 464.

In *Snodgrass v. Robinson*, 512 F.3d 999 (8th Cir. 2008), the Eighth Circuit affirmed a district court's dismissal of an *ex post facto* claim pursuant to Rule 12(b)(6). *Id*. at 1000-01. Snodgrass challenged an Iowa law that altered commutation procedures by changing the frequency with which a life sentenced prisoner could apply to the Governor for commutation. In addressing the plaintiff's challenge, the Eighth Circuit explained that

the focus of the *ex post facto* inquiry is not on

53

whether a legislative change produces some ambiguous sort of "disadvantage," nor . . . on whether an amendment affects a prisoner's "opportunity to take advantage of provisions for early release," but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable. Simply put, not every change in the law raises ex post facto concerns. The changed law must create a "significant risk" of increasing the offender's punishment.

Here, Snodgrass's claim does not hinge on the availability of parole, but on the availability of a commutation--the only means by which she might become eligible for parole. Whereas changes to parole procedures may, in some circumstances raise *ex post facto* concerns, changes to Iowa's procedures for commutation applications do not. This is because most parole procedures are distinct from the highly personal, policy oriented, and legislatively unchecked authority of the Iowa governor to grant sentence commutations.

The unpredictability of a wholly discretionary grant of commutation in Iowa precludes Snodgrass from demonstrating that the changes in Iowa's law raise a "significant risk" that she will be denied a commutation she otherwise would

> have received. As such, she cannot demonstrate
> there is a significant risk her punishment will be
> longer than it would have been under former Iowa
> Code Section 902.2. Accordingly, she cannot
> make out an *ex post facto* claim.

*Id.* at 1002-03 (citations and footnote omitted); *see also Smith v. Sampson*, 2009 U.S. Dist. LEXIS 84657 (E.D. Mich. Sept. 17, 2009) (granting defendants' motion to dismiss plaintiff's *ex post facto* claim challenging a change in commutation procedures in Michigan that are similar to those in Pennsylvania).

In *Smith*, the plaintiff's "claim [was] that the commutative effect of changes in [Michigan] state law have impaired his opportunity for commutation in violation of the *Ex Post Facto* Clause of the United States Constitution." *Smith*, 2009 U.S. Dist. LEXIS 84657 at *3. In opposing the defendants' motion to dismiss, Smith argued that, under *Garner,* he was entitled to show, "by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, . . . its retroactive application will result in a longer period of incarceration than under the earlier rule" because "the requisite risk was not inherent in the framework of an amended rule." *Id*. at *4 (citing *Garner*, 529 U.S. at 255). The district court held that *"Garner* [is] distinguishable given the differences in the discretionary authority of the parole board and the governor." *Id*. Citing *Snodgrass*, the district court granted the defendants' motion to dismiss based upon its determination that Smith "cannot show that the change [in the law] creates a

55

'significant risk' that he will be denied a commutation" because "the impact of any change in the law . . . will never be more than speculative relative to the governor's exercise of her right to commute sentences. *Id*. at \*8 (citing *Snodgrass*, 512 F.3d at 1002 n.2).

It is well settled that, "[a]s a matter of law, parole and commutation are different concepts, despite some surface similarities." *Solem*, 463 U.S. at 300. In *Solem*, the Supreme Court explained:

> Parole is a regular part of the rehabilitative process. Assuming good behavior, it is the normal expectation in the vast majority of cases. The law generally specifies when a prisoner will be eligible to be considered for parole, and details the standards and procedures applicable at that time. *See, e. g., Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1 (1979) (detailing Nebraska parole procedures); *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972) ("the practice of releasing prisoners on parole before the end of their sentences has become an integral part of the penological system"). Thus it is possible to predict, at least to some extent, when parole might be granted.

*Id*. at 300-01.

The Constitutions of the United States and of the

Commonwealth of Pennsylvania entrust clemency decisions to the sole discretion of the executive branch. *See* U.S. Const. art. II, § 2, cl. 1 (the President "shall have Power to grant Reprieves and Pardons for Offenses against the United States . . ."); Pa. Const. art. IV, § 9 (a) ("In all criminal cases except impeachment the Governor shall have power to remit fines and forfeitures, to grant reprieves, commutation of sentences and pardons . . .").

The genesis of the doctrine of the sovereign power to grant clemency in the United States is found in the English common law. "In England, the clemency power was vested in the Crown and can be traced back to the 700's." *Herrera v. Collins*, 506 U.S. 390, 412 (1993). As the Supreme Court explained in *Schick v. Reed*, 419 U.S. 256 (1974):

> At the time of the drafting and adoption of our Constitution it was considered elementary that . . . the king may extend his mercy on what terms he pleases, and consequently may annex to his pardon any condition that he thinks fit.

*Id.* at 261 (quotation marks and citation omitted). Historically, the exercise of clemency authority has been considered "a matter of grace." *See, e.g., Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 282 (1998) (a petition for commutation is a "unilateral hope"; clemency is "a matter of grace"); *United States v. Wilson*, 32 U.S. 150, 160 (1833) ("A pardon is an act of grace").

In *Wilson*, drawing on England's historical and judicial

57

experience, Chief Justice John Marshall explained the origin of the executive pardon:

> The constitution gives to the president, in general terms, "the power to grant reprieves and pardons for offences against the United States."

> As this power had been exercised, from time immemorial, by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance[,] we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it.

> A pardon is an act of grace, proceeding from the power entrusted with the execution of the laws, which exempts the individual, on whom it is bestowed, from the punishment the law inflicts for a crime he has committed. It is the private, though official act of the executive magistrate, delivered to the individual for whose benefit it is intended, and not communicated officially to the court. It is a constituent part of the judicial system, that the judge sees only with judicial eyes, and knows nothing respecting any particular case, of which he is not informed judicially. A private

deed, not communicated to him, whatever may be its character, whether a pardon or release, is totally unknown and cannot be acted on. The looseness which would be introduced into judicial proceedings, would prove fatal to the great principles of justice, if the judge might notice and act upon facts not brought regularly into the cause. Such a proceeding, in ordinary cases, would subvert the best established principles, and overturn those rules which have been settled by the wisdom of ages.

*Wilson*, 32 U.S. at 160-61.

In *Ex parte Wells*, 59 U.S. 307 (1856), the Court again addressed the origin and exercise of executive clemency:

At the time of our separation from Great Britain, [the pardon] power had been exercised by the king, as the chief executive. Prior to the revolution, the colonies, being in effect under the laws of England, were accustomed to the exercise of it in the various forms, as they may be found in the English law books. They were, of course, to be applied as occasions occurred, and they constituted a part of the jurisprudence of Anglo-America. At the time of the adoption of the constitution, American statesmen were conversant with the laws of England, and familiar

59

with the prerogatives exercised by the crown. Hence, when the words to grant pardons were used in the constitution, they conveyed to the mind the authority as exercised by the English crown, or by its representatives in the colonies. At that time both Englishmen and Americans attached the same meaning to the word pardon. In the convention which framed the constitution, no effort was made to define or change its meaning, although it was limited in cases of impeachment.

*Id*. at 311.

In *Herrera*, the Court reaffirmed the traditional conception of clemency as a function of the executive branch, separate from adjudicatory proceedings within the Judicial Branch. *Herrera*, 506 U.S. at 411-13. The Court noted that one of the great advantages of monarchy is "that there is a magistrate, who has it in his power to extend mercy, wherever he thinks it is deserved: holding a court of equity in his own breast, to soften the rigour of the general law, in such criminal cases as merit an exemption from punishment." *Id*. at 412 (quoting 4 William Blackstone, Commentaries on the Laws of England *397). In *Dumschat*, the Court instructed that "pardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." *Dumschat*, 452 U.S. at 464; *see also Ohio Adult Parole Auth.*, 523 U.S. at 289 ("[I]t is true that 'pardon and commutation decisions have not traditionally been

the business of courts . . .'") (quoting *Dumschat,* 452 U.S. at 464)).

> The Pennsylvania courts have held that the judiciary
>
> can[not] impinge upon the exclusive jurisdiction of the executive branch of the government in [determining whether to commute a sentence]. Action by the Board of Pardons is in accordance with constitutional provisions and in no way comes under the aegis of the courts. Indeed, were a court to review the conduct of a hearing before the Board of Pardons it would be a clear invasion by judicial direction of the immunity granted the executive branch of our government. Such is not consonant with our constitutional doctrine of separation of powers.

*Commonwealth ex rel. Cater v. Myers*, 412 Pa. 67, 71 (1963) (quoting *Mississippi v. Johnson*, 4 Wall. 475 (1866), which held that "[t]he Congress is the legislative department of the government; the President is the executive department. Neither can be restrained in its action by the judicial department"), *cert. denied*, 376 U.S. 933 (1964); *see also Commonwealth v. Gaito*, 419 A.2d 1208, 1212 (Pa. Super. Ct. 1980) ("The Governor's power to commute sentences, on recommendation of the Board of Pardons, is exclusive, and courts may not in any way impinge on the exercise of this power.").

The Supreme Court has instructed that there are four

61

exceptions to the sovereign's executive clemency powers. First, a pardon cannot interfere with the vested property rights of third parties in violation of the Takings Clause. *See* U.S. Const. amend. V ("Nor shall private property be taken for public use, without just compensation."); *see also Knote v. United States*, 95 U.S. 149, 154 (1877) ("Neither does the pardon affect any rights which have vested in others directly by the execution of the judgment for the offence, or which have been acquired by others whilst that judgment was in force."); *Ex parte Garland*, 71 U.S. 333, 381 (1866) ("There is only this limitation to [the pardon power's] operation: it does not restore offices forfeited, or property or interests vested in others in consequence of the conviction and judgment."). Second, in *Hart v. United States*, 118 U.S. 62 (1886), the Court instructed that a pardon cannot require the payment of funds from the Treasury in violation of the Spending Clause. *Id*. at 67; *see also Knote*, 95 U.S. at 154 ("The power of the pardon . . . cannot touch moneys in the treasury of the United States, except expressly authorized by act of Congress. The Constitution places this restriction upon the pardoning power."). Third, a pardon cannot require a prisoner to forfeit his constitutional rights unreasonably. *See Schick*, 419 U.S. at 266 (noting that the pardon power "permits the attachment of any conditions which does not otherwise offend the Constitution").

The Supreme Court has also instructed that the procedures by which a pardon is granted must comply with the Due Process Clause of the Fifth Amendment. *Ohio Adult*

*Parole Auth.*, 523 U.S. at 276. "The Due Process Clause is not violated, [however], where . . . the procedures in question do no more than confirm that the clemency and pardon power is committed, as is our tradition, to the authority of the executive." *Id*. Justice O'Connor explained in her concurrence in *Ohio Adult Parole Auth.*:

> [A]lthough it is true that "pardon and commutation decisions have not traditionally been the business of courts," *Dumschat, supra,* at 464, and that the decision whether to grant clemency is entrusted to the Governor under [state] law, I believe that the Court of Appeals correctly concluded that some *minimal* procedural safeguards apply to clemency proceedings. Judicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process.

*Id.* at 289 (O'Connor, J. concurring).[10]

Beyond these judicially imposed limitations on the

---

[10]The Pennsylvania Prison Society has not appealed from the District Court's denial of the Plaintiffs' due process claim in this cross-appeal.

executive clemency power, the remaining checks on the sovereign power of the President or of a Governor are left to the legislative branch and to the powers vested in the people.[11]

Here, the voters of the Commonwealth of Pennsylvania expressly voted to limit the Governor's clemency power, as they are empowered to do under Article XI of the Pennsylvania Constitution. Pa. Const. art. XI. By mandating that all recommendations for a commutation considered by the Governor must first be approved by a unanimous vote of the Board of Pardons, the 1997 Amendment restricted, but did not

---

[11]For example, Congress can check misuse of the pardon power by impeaching the President. *See e.g.,* U.S. Const. art. I, § 2, cl. 5 ("The House of Representatives ... shall have the sole Power of Impeachment."); *id.* art. I, § 3, cl. 6 ("The Senate shall have the sole Power to try all Impeachments."); *id.* art. II, § 4 ("The President ... shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other High Crimes and Misdemeanors."); *Ex parte Grossman*, 267 U.S. 87, 121 (1925) (noting that the President could be impeached if he pardoned too many criminal contempts). The voters also have the ability to check the executive clemency power by choosing not to re-elect a President or Governor whom they believe may be inappropriately using the pardon power. *Morrison v. Olson*, 487 U.S. 654, 711 (1988) (Scalia, J., dissenting) ("Ultimately, there is the political check that the people will replace those in the political branches . . . who are guilty of abuse.").

absolutely foreclose, the exercise of the Governor's sovereign power to grant a commutation to inmates sentenced to life imprisonment. The power to grant or deny commutations, as prescribed by the Commonwealth's voters, rests solely with the executive branch which may "deny the requested relief for any constitutionally permissible reason or for no reason at all." *See Dumschat*, 452 U.S. at 467 (Brennan, J. concurring) (stating that an inmate sentenced to life imprisonment for murder has "no protectible liberty interest in a pardon" (citing *Meachum*, 427 U.S. at 228)). Accordingly, the Pennsylvania Prison Society has not demonstrated that it has a viable claim that the 1997 Amendment raises a "significant risk" that commutations will be denied that otherwise would have been received. *Snodgrass*, 512 F.3d at 1002.

**2**

The Board of Pardons also argues that the 1997 Amendment does not violate the *Ex Post Facto* Clause because it does not "increase[] the penalty" by which a crime is punishable of inmates who are sentenced to life without the possibility of parole. (Appellants' Reply Br. 10.) *See Morales*, 514 U.S. at 505. The District Court held that the retrospective application of the 1997 Amendment violates the *Ex Post Facto* Clause because the "change in voting requirements, from majority to unanimity, creates more than a speculative and attenuated risk of increasing the measure of punishment applied to life sentenced inmates" and "disadvantage the applicants." *Pa. Prison Soc'y v. Rendell*, 419 F. Supp. 2d at 661.

65

Citing the standard set forth in *Garner*, the District Court considered "evidence drawn from the [new law's] practical implementation," i.e., an analysis of the parties' stipulated rate and frequency of commutations granted to life-sentenced inmates in Pennsylvania between 1970 and 2005, and concluded that as applied to those inmates sentenced after its effective date, the 1997 Amendment posed a "significant risk" of increased punishment. *Pa. Prison Soc'y v. Rendell*, 419 F. Supp. 2d at 660-61 n.1 & n.2. Based upon its finding that "the total number of recommendations by the [Pardons] Board for commutation for life sentenced prisoners [was] significantly lower than the number of recommendations in the eight years prior to the [1997 A]mendments' passage," the District Court concluded:

> [E]ven though a less than unanimous vote did not guarantee a life sentenced prisoner commutation prior to the passage of the 1997 amendments and although commutation is not completely foreclosed following the passage of the amendments, the 1997 amendments significantly reduced the likelihood of a life sentenced prisoner receiving a recommendation by the Board for commutation and, as such, the 1997 amendments make commutations and parole even more remote for those inmates.

*Id.* at 660-61.

In granting the Prison Society's Motion for Summary

66

Judgment, the District Court based its decision on the following passage from *Mickens-Thomas v. Vaughn*:

> [A]n offender, prior to his conviction and sentencing, is entitled to know not only his maximum possible punishment, but also his or her chances of receiving early release, since this too is a relevant factor in the plea bargaining calculus. An adverse change in one's prospects for release disadvantages a prisoner just as surely as an upward change in the minimum duration of sentence.

*Pa. Prison Soc'y v. Rendell*, 419 F. Supp. 2d at 659 (quoting *Mickens-Thomas*, 321 F.3d at 392).

*Mickens-Thomas* involved an *ex post facto* challenge to a "material modification of [Pennsylvania] parole laws." *Mickens-Thomas*, 321 F.3d at 376 (emphasis added). Mickens-Thomas was convicted of rape and murder in 1964. *Id.* He was sentenced to life in prison. The Governor of Pennsylvania commuted Mickens-Thomas's life sentence. *Id.* at 377. In December 1996, the Pennsylvania legislature changed the law concerning the decision-making policies of the Pennsylvania Board of Probation and Parole to require that the "primary consideration" in determining whether a prisoner was eligible for release on parole was "the risk to public safety by the parole petitioner as the dominant factor in evaluating parole applications." *Id.* "The 1941-1996 statute, in effect at the time

67

of Thomas's conviction, made no specific mention of public safety." *Id*. Mickens-Thomas was denied <u>parole</u> over the course of the following three years for various reasons, including that his past crime was a sex offense and that he was "in a 'deniers' group – those who deny responsibility for the underlying offense." *Id*. at 381 (emphasis added).

In December 1999, Mickens-Thomas filed a petition for a writ of habeas corpus in the United States District Court "alleg[ing] that the Board denied his parole in violation of the *Ex Post Facto* clause, by applying retroactively the revised December 1996 parole statute." *Id*. at 383.

The district court in *Mickens-Thomas* held that the Pennsylvania Board of Probation and Parole "retroactively applied this [statutory] policy change adversely to the <u>parole</u> applications of Louis Mickens-Thomas . . . in violation of the *Ex Post Facto* clause." *Id*. at 376 (emphasis added). This Court affirmed, holding that "to retroactively apply changes in the <u>parole</u> laws[,] made after conviction for a life sentence in Pennsylvania that adversely affect the release of prisoners whose sentences have been commuted, violates the *Ex Post Facto* clause." *Id*. at 393 (emphasis added). This Court also concluded that:

> Pre-1996, a prisoner could be denied parole because of public safety concerns only if those concerns together with other relevant factors outweighed, by a preponderance, the liberty

68

> interests of the inmate.  The 1996 policy change placed first and foremost the public safety to the disadvantage of the remaining liberty interest of the prisoner.

*Id.* at 385.

The issue presented in *Mickens-Thomas* is similar to the arguments raised by the petitioners in *Weaver, Morales,* and *Garner* in challenging the denial of release on parole.  In each of these cases, prisoners seeking release on parole challenged a statutory change in parole release laws.  Mickens-Thomas was sentenced to life without the possibility of parole.  He challenged the retrospective application of Pennsylvania's parole laws, not the procedures employed by the Board of Pardons for prisoners seeking a commutation.

In support of its decision on this matter, the District Court relied on this Court's statement in *Mickens-Thomas* that "'eligibility for a commutation of a life sentence entails the possibility of parole[,]' and although commutations 'are quite rare,' application of the new parole policies rendered Thomas' prospects for parole 'even more remote' in violation of the *Ex Post Facto* Clause." *Pa. Prison Soc'y v. Rendell*, 419 F. Supp. 2d at 659 (quoting *Mickens-Thomas*, 321 F.3d at 392).  Based upon this comment, the District Court concluded that the retroactive application of the 1997 Amendment to the Governor's sovereign clemency powers created a "significant risk" of increased punishment for life-sentenced prisoners.  *Id.*

69

We disagree. *Mickens-Thomas* is not dispositive on the question whether the 1997 Amendment, which concerned the executive clemency power, impaired a prisoner's rights under the *Ex Post Facto* Clause. *Mickens-Thomas* solely concerns a prisoner's right to <u>parole</u>. It does not address the viability of a claim challenging the scope of a Governor's clemency power to grant commutation.

Furthermore, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex,* 442 U.S. 1, 7 (1979). "The unpredictability of a wholly discretionary grant of commutation . . . precludes [plaintiffs] from demonstrating that the changes in . . . [the] law raise a 'significant risk' that [plaintiffs] will be denied a commutation [they] otherwise would have received." *Snodgrass*, 512 F.3d at 1002. "As such, [Plaintiffs] cannot demonstrate there is a significant risk [their] punishment will be longer than it would have been under former [law]." *Id*.

There is no *ex post facto* violation where a retroactively applied law does not make one's punishment more burdensome, but merely creates a disadvantage. *See Hameen v. Delaware*, 212 F.3d 226, 238 n.2 (3d Cir. 2000) (explaining that a law is not *ex post facto* merely because it worked to the detriment or substantial disadvantage of the defendants) (quotations and citations omitted). The Pennsylvania Prison Society is representing the interests of prisoners who are serving a maximum sentence of life without the possibility of parole. *See*

70

*Mickens-Thomas*, 321 F.3d at 377 ("Life sentences in Pennsylvania presumptively exclude any possibility of parole."). "[I]n Pennsylvania, . . . the legal sentence is the maximum sentence." *Commonwealth v. Sutley*, 474 Pa. 256, 268 (1977) (citations omitted); *see also Commonwealth v. Daniel*, 430 Pa. 642 (1968) ("Under Pennsylvania law . . . the maximum sentence is the only portion of the sentence which has legal validity . . . ."). The 1997 Amendment, therefore, does not "increase[] the penalty by which [any of Plaintiffs'] crime[s] [were] punishable," because all of the crimes for which the prisoners represented by the Pennsylvania Prison Society were convicted were punishable by life in prison without the possibility of parole at the time they were convicted and validly sentenced. *Morales*, 514 U.S. at 506.

We disagree with the District Court's conclusion that the retrospective application of the 1997 Amendment to the Governor's clemency power "creates more than a speculative and attenuated risk of increasing the measure of punishment applied to life sentenced inamtes." *Pa. Prison Soc'y v. Rendell*, 419 F. Supp. 2d at 661 (emphasis added).

**3**

Finally, the Board of Pardons argues that "the [District C]ourt should have determined that, on its face, that [the Second Amended Complaint] presented no viable *ex post facto* claim arising from the 1997 constitutional amendment changing the voting procedures of the Board of Pardons." (Appellants' Op.

71

Br. 28-29.)  "Changes in procedures that might make it more difficult to obtain . . . clemency do not carry with them *ex post facto* consequences."  (Appellants' Reply Br. 16.)

"Although the prohibitions against *ex post facto* laws cannot be evaded just by calling a change in law procedural, only the 'alteration of a substantial right' is forbidden."  *United States v. Molt*, 758 F.2d 1198, 1200 (7th Cir. 1985) (quoting *Weaver*, 450 U.S. at 29 n.12, and holding that a "change in the standard for bail pending appeal is not an *ex post facto* law"); *see also McKenzie v. Day*, 57 F.3d 1461, 1469 (9th Cir. 1995) (McKenzie's claim that the state violated his rights under the *ex post facto* clause by changing the place and procedures applicable to his execution is precluded by *Holden v. Minnesota*, 137 U.S. 483 (1890), which stands for the proposition that such matters are "regulations that do not affect [the prisoner's] substantial rights.").

> In *Molt*, the Seventh Circuit explained that
>
> the presumption is against construing a procedural change as an *ex post facto* law, and [that] must carry the day in the absence of a stronger showing than made in this case that the change works an increase in punishment. For though we have been speaking of the Bail Reform Act as if it had abolished the right to bail pending appeal, it did no such thing; it merely made it harder to get bail pending appeal . . . The change in the balance of

72

advantages against the defendant is too slight to bring the change within the scope of the *ex post facto* clause.

*Molt*, 758 F.2d at 1200.

We agree with the Board of Pardons that the 1997 Amendment presents no viable *ex post facto* claim because it only concerns a change in the voting procedures employed by the Board of Pardons, a change that does not affect the prisoners' substantial rights and thus one that is "too slight" to bring it within the scope of the *Ex Post Facto* Clause. *Molt*, 758 F.2d at 1200.

**B**

We are persuaded that the District Court erred as a matter of law when it failed to grant the Commonwealth's Motion to Dismiss Plaintiffs' *ex post facto* claim pursuant to Rule 12(b)(6). For the same reasons, the District Court also erred in granting summary judgment in favor of the Pennsylvania Prison Society.

"Generally, a denial of a motion to dismiss does not conclusively determine anything because it merely decides that questions of fact remain to be decided." *Pan Eastern Exploration Co. v. Hufo Oils*, 798 F.2d 837, 839 (5th Cir. 1986) (citing *Coleman by Lee v. Stanziani*, 735 F.2d 118, 120 (3d Cir. 1984)). "If, [however,] on appeal from a final judgment, an appellate court finds that the motion to dismiss should have been granted, it can direct the lower court to dismiss." *Id*. at 840; *see*

73

*also Stinson v. Kaiser Gypsum Co.*, 972 F.2d 59, 63 (3d Cir. 1992) (reversing where "the district court should have granted Kaiser's motion to dismiss based on Pennsylvania's two-year statute of limitations" and remanding "so that it may do so"); *Liotta v. Nat'l Forge Co.*, 629 F.2d 903, 908 (3d Cir. 1980) (reversing district court's grant of summary judgment where a motion to dismiss should have been granted and the case remanded for further proceedings); *Gardner v. The Calvert*, 253 F.2d 395, 398 (3d Cir. 1958) (same).

## IV

The Pennsylvania Prison Society argues in their cross-appeal that the District Court erred because "[i]t did not enter a declaratory judgment; it did not enter an injunction; it did not even specify to whom, if anyone, its judgment applies. (Appellees'/Cross-Appellants' Br. 48-49.) Based upon our conclusion that the Commonwealth's Motion to Dismiss Plaintiffs' *ex post facto* claim pursuant to Rule 12(b)(6) should have been granted because Plaintiffs have failed to state a viable *ex post facto* claim, we will affirm the District Court's denial of the Pennsylvania Prison Society's request for a declaratory judgment and injunctive relief. *See Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1088 n.21 (11th Cir. 2007) (this Court may affirm on any ground supported by the record).

## CONCLUSION

For the foregoing reasons, we reverse the District Court's grant of summary judgment in favor of the Pennsylvania Prison

Society and remand this matter with instructions that the District Court shall enter an order dismissing this action.